[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 318 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 319 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 320 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 322 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 323 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 324 
Two general questions were litigated in this case — whether the defendants were shown to have been guilty of negligence, and if they were, whether the conduct of the plaintiff's intestate, on the occasion of the injury, was also negligent in a degree which contributed to produce the fatal result. If the second position is established, it is too well settled to need a reference to authority that the plaintiff cannot recover. The collision occurred in the city of Troy, where the defendant's railroad crosses Fourth street upon the same grade with the street. Such arrrangement of thoroughfares renders the travel, at the point where the railroad and the street coincide, especially in a large town, unusually hazardous, and they call for a high degree of caution both on the part of the managers of the railroad and of individuals, who, in using the street, have occasion to cross its track; and it may well be doubted whether, as a question of policy, they ought to be permitted by public authority. They are, however, tolerated by law, and our duty, in the cases which are brought before us, is to determine, in view of the nature of the subject, and of the special facts presented, upon whom the culpability *Page 325 
in the particular instance rests. The defendants having the general right in this case to run their engines and cars across the street, they must be shown to have committed some fault in the manner of doing it. It is not enough to point to the deplorable result which ensued, and show that it was attributable to the running of the train across the street, but it must be shown that there was something improper in the manner of running the train, before the defendants can be made responsible for the consequences. It is suggested that the train was out of time, and the proof certainly is that the regular time for starting was about eleven o'clock in the forenoon, and the collision is admitted to have occurred about noon, and the distance that had been ran would have required but a few minutes. But it is in proof that between thirty and forty trains pass over the road each day. However perfect the arrangements of a railroad management may be, they cannot, of course, be entirely independent of accidental circumstances, which may prescribe the period of setting out and arriving. No person can reckon with any sort of safety upon the point of time when a train will pass over a particular place; and where the trains are so numerous as on this road, it would be impracticable for a traveler on an intersecting street to protect himself by learning the times of arrival and departure of the several trains, and there is no pretence that anything of the kind was attempted by the deceased in the present instance. No one can be secure against being met by an engine except by ascertaining by his own senses that no train is approaching in either direction within a distance which will endanger his safety. There is no ground for attributing any negligence to the defendants in respect to the flagman. I will assume that it was their duty to place a person at the point of intersection to warn persons against crossing when trains were approaching; and this was done in the present instance. The evidence is clear beyond contradiction, that such a person was stationed between the *Page 326 
two tracks with a flag, when the train and the deceased were approaching the spot where the collision happened. That he did his whole duty by displaying his flag and warning passengers off by remaining as long as he possibly could, consistently with his own safety, is sufficiently apparent from the evidence, and from the fact of his being knocked down by the horse of the deceased and his barely escaping being run over by the engine. But the allegation of negligence principally relied on is that the train was being ran at an unusual and dangerous rate of speed. This involves the question, in the first place, as to the rapidity at which the train may be run in a city where the intersecting streets are upon the same level. As the law has not fixed the speed at which they may be run, it is generally a question of fact in each case whether the actual rate was excessive or dangerous. Whether it is so or not, will depend, to some extent, upon the safeguards which are adopted to prevent accidents. It is not correct to say that in every case where a fault in this respect is alleged, the question must be submitted to the jury. If it be clearly shown, that on the occasion in question the velocity was not greater than that which had been usually practiced for a considerable period, with the tacit consent of the community and without accident, it should not be considered an open question whether running at that rate was negligent and unlawful.
The other question, as to the actual speed at which the train was run, is yet more difficult. The persons concerned in the management of the train, as engineers, conductor, firemen, and the like, have the best opportunity of judging, on account of their situation, the nature of their duties, and the experience which their employment must give them. But they are subject to a natural bias in favor of a determination which shall exempt them from censure. A passenger, if his attention is attracted to the subject at the proper time, has some advantages over a bystander, and the latter is legally competent to speak upon the question, but *Page 327 
his evidence is entitled to but little weight, unless some special circumstance led him to think of the question at the time the transit was taking place; nor then, unless he had been in the habit of observing the passing of trains and estimating their speed. In this case the servants of the defendant, five in number, unite substantially in declaring that the speed did not exceed that which was usual, namely, about five or six miles per hour. On the other hand, a passenger, who thinks his attention was at the time directed to the subject, and three other of the plaintiff's witnesses who were standing in the street, testify more or less strongly that the running was unreasonably and unnecessarily rapid, and reaching, according to some of them, to twenty miles an hour. Some criticisms may be justly applicable to one or more of these witnesses, but I think there was a sufficient conflict of evidence to render it improper to take the question from the jury, if the determination of the case depended upon it. I am far, however, from saying that, as a juryman, I should have found, as the just result of the whole evidence, that the allegation of negligence in this respect was established. The great danger of immoderate running in such a locality, whatever collateral safeguards may be provided, should admonish the governing authority of these companies to take extraordinary care — not only that it should not be indulged in, but that unimpeachable evidence should be at hand to demonstrate — that excess in this respect had never occurred.
Upon the other general question, I am of opinion that the uncontradicted evidence was such as not to present anything for the jury to deliberate upon. If one will heedlessly or rashly drive upon the track of a railroad where trains are constantly or frequently passing, without taking pains to ascertain whether one is actually approaching or not, it will strike every one intuitively that he is running a great and unnecessary risk. A crossing can rarely, if ever, be so situated as to render it impossible or difficult *Page 328 
for a traveler to observe the track on each side for a sufficient distance to determine whether it is safe to proceed. If such localities exist, they should not be crossed at all; and it would be equally imprudent in the company to tolerate them, and in the passenger to use the crossing. If the case is such as to require the person wishing to cross to come near the track to make his observation, that circumstance, so far from excusing him from the duty of looking at all, would only render that duty more imperative, if he would avoid the imputation of negligence. The evidence in this case shows that the track of the railroad, east of the Fourth street crossing, was upon a straight course for the distance of at least six hundred and fifty feet from that crossing. Although there were buildings on the east side of Fourth street, yet the whole distance I have mentioned could be seen by a person approaching, as the deceased did, on Fourth street, from the south, before entering upon the track. If the train had been beyond the range of his vision, when he came near the crossing, there would have been ample time for him to drive leisurely across both tracks, which were, together, including the space between them, only seventeen feet wide. But if he saw the train coming towards the crossing, and determined to try the speed of his horses against that of the approaching engine, he did it, I think, at his peril. And the case would be the same if he heedlessly drove upon it without concerning himself to ascertain that it could be safely done. That he had an opportunity to see the train, if he had looked, in time quite sufficient to avoid all danger, either by stopping or by turning to the sidewalk, is certain, upon the testimony of every witness who has spoken on the subject. That he did in fact see it at some time before the collision is evident from the testimony of all the witnesses to the principal fact; for they swear that he whipped his horses in order to get across before the engine should reach him. It may be, as one of the plaintiff's witnesses *Page 329 
testified, that when this took place he had advanced too far to stop or turn. But I can perceive no possible reason why he did not, when sufficiently near to observe the track in the direction from which the train was approaching, use that natural and indispensable precaution. I have thus far omitted any mention of the other warnings that were shown to have been given. There was no material contradiction of the evidence showing that the whistle was sounded and the bell rung in sufficient season to warn any person who was at or near the Fourth street crossing. It was sworn to by seven witnesses, embracing the defendants' servants on the cars, and other persons who were at Fourth street. It did not raise any question for the jury for two or three other persons to swear that they did not hear, or did not remember to have heard these signals until immediately after the collision. It is matter of common observation that persons who are habitually in a situation to hear the passing of railroad trains fail to notice the noises which accompany them. If a jury could be permitted to find, against the evidence which was given in this case, that these warnings were not given until it was too late for them to be useful, there could be no longer any truth in human testimony. The evidence of personal warning to the deceased was very strong, and was substantially uncontradicted. The flagman heard the whistle and bell, and after so hearing them he went from his flag-house, got his flag and stationed himself on the track at the crossing and waved the flag. At that time there was no person crossing the track, though there were teams on the south side of the railroad which were stopped. A woman with a child attempted to cross from the other side, and while he was engaged in keeping her off he was struck by the team and knocked down and barely escaped from being run over by the engine. A Mrs. Banker lived in a house at the northeast corner formed by the intersection of the railroad with Fourth street, and was at the time sitting at a window *Page 330 
in the second story fronting the track. According to her testimony she heard the whistle and bell and looked out before the cars came, and then saw the deceased approaching on a fast trot, and hallooed to him twice to stop. He looked around, raised his whip and struck his horses. She saw the flagman hold his flag and saw him knocked down, and his flag fall. She is supposed to be contradicted by Martin O'Laughlin, one of the plaintiff's witnesses who swore he was standing on the threshold of the front door of the same house. This would be some evidence that her exclamation was not sufficiently loud to be heard in the street, but it does not draw in question the fact that she saw the deceased approaching towards apparent danger before the cars were in sight, and when it was in time for him to have stopped his horses. Two other witnesses for the defendants, Orr and O'Brien, testified that they were standing in Fourth street, on the south side of the railroad, and about three feet from the track. Orr said O'Brien shouted to the deceased three times, and they united in saying that O'Brien stepped forward to grasp the horses. Witnesses were examined as to the character of both these persons, and their testimony was unfavorable to their character. In examining a judgment of non-suit we can only rely upon evidence which is substantially uncontradicted and unimpeached, and I have therefore formed my conclusion in this case from the evidence other than that given by Orr and O'Brien. Laying aside their testimony, I find it established beyond contradiction that the deceased drove his horses on to the defendant's road, without giving any attention to the track, with a view to see whether a train was approaching, when such attention as a man having ordinary discretion and prudence would have bestowed, would have disclosed the advance of the train and would have effectually preserved him from danger. The truth plainly was that he gave no heed to the railroad before him until he came very near it, and then chose to try the *Page 331 
experiment of endeavoring to cross it in front of the engine, for that purpose applying the whip to his horses. But they became restive and uncontrollable, partially stopped upon the track, and the wagon was hit, and the deceased was fatally injured. Several such cases have come into the courts. In Spencer v. The Utica Schenectady Railroad Co. (5 Barb. 337), the person injured, who was the driver of the wagon, was in a condition to see the train, and either suffered his attention to be directed to another object, so as not to observe it, or seeing it, thought he could drive across the track before it would strike him, and erred in his reckoning. He miscalculated and was struck. The court set aside the report of referees in his favor, though the judges admitted that negligence on the part of the defendant was established. In Steves v. The Oswego and Syracuse RailroadCo., in this court (18 N.Y.R. 422), there was sufficient evidence in the view of a majority of the judges to submit the question of the negligence of the defendants to the jury, and yet a non-suit was sustained on the ground that the plaintiff drove on to the track without looking up and down to see if a train was approaching, it being evident that such observation would have disclosed the advance of the train. The same principle was affirmed when the present case was before this court on a former occasion. The plaintiff gave some additional evidence on the second trial, but it was not of a character to change the opinion which I then formed upon this point of the case.
I am in favor of affirming the judgment of the supreme court.
All the judges concurred except HOGEBOOM, J.