or to affirm the judgment of the appellate division upon this question; placing its decision upon an entirely separate and distinct ground.

It seems to me that unless we are to abrogate the rule, once thoroughly established, that an employer was not bound to change the location and situation of his structures like the one in question, and that an employé assumed the risks incident to a perfectly open and patent condition, we must be led to the conclusion in this case that plaintiff is to be charged, as matter of law, with the risks which resulted in his accident.

In addition to this main issue, in my judgment there are exceptions to the rulings of the trial judge which present close and somewhat troublesome questions; but, in view of the conclusion reached upon the proposition above discussed, it does not seem necessary to go over them at length.

The judgment and order should be reversed, and a new trial granted, with costs to appellant to abide event.

McLENNAN, J., concurs.

(70 App. Div. 505.)

### FLANAGAN v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. March 11, 1902.)

1. RAILROADS—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

   Deceased, approaching a railway grade crossing for the purpose of crossing it, looked along the track in both directions, and looked a second time in one direction, when a train struck him and killed him. The view of the track was obstructed by buildings, so that an approaching train could not be seen by a traveler on the street until he came within about 35 feet of the crossing, where an engine could be seen at a distance of about 159 feet from the crossing, and at 25 feet from the crossing it could be seen at a distance of about 1,275 feet. The accident occurred on a dark night, while there was a commotion at the crossing. An automatic gong, signaling the approach of trains, was out of order, and gave no warning. *Held*, that the question of deceased's contributory negligence was for the jury.

2. SAME—NEGLIGENCE OF DEFENDANT.

   Plaintiff's evidence tended to show that the train killing deceased at a crossing in a village was run at a speed of from 20 to 25 miles an hour, and that it gave no signal, either by blowing the steam whistle or by ringing the bell. Defendant's evidence tended to show that the train's speed did not exceed 8 miles an hour, and that the bell was rung. The automatic gong signaling the approach of trains sounded no alarm. *Held*, that the question of defendant's negligence was for the jury.

3. SAME—NEGLIGENCE OF DRIVER.

   Though the negligence of a driver, resulting in a railroad crossing accident, cannot be imputed to a person accepting an invitation to ride, without having any control of the horse, such person is not relieved from the duty of acting for himself in a reasonably careful and prudent manner.

4. SAME—SPEED OF TRAIN—OPINIONS OF NONEXPERTS.

   The speed at which a train was running is not a question wholly for experts, but may be shown by the testimony of persons of ordinary experience.

   McLennan and Williams, JJ., dissenting.

Appeal from trial term, Oswego county.

Action by May A. Flanagan, as administratrix of the estate of Peter Flanagan, deceased, against the New York Central & Hudson River Railroad Company, as lessee of the Rome, Watertown & Ogdensburg Railroad Company. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before McLENNAN, SPRING, WILLIAMS, HISCOCK, and DAVY, JJ.

Henry Purcell, for appellant.

Thomas Hogan, for respondent.

DAVY, J. This action was brought to recover damages for the alleged negligence of the defendant in causing the death of plaintiff's intestate, who was killed at a grade crossing in the village of Fulton, Oswego county, N. Y., about 8 o'clock in the evening of August 19, 1900. The original plaintiff was Bridget Flanagan, as administratrix, etc., who was the widow of the deceased; but she having died since the entry of judgment, the present plaintiff, a daughter of the deceased, has been substituted in her place. The railroad tracks run north and south through Seneca street, in said village, and the highway crossing upon which the deceased was killed runs east and west. It appears from the testimony that upon the afternoon of the day that the intestate was killed, which was Sunday, he left his home with one James Horan, with a horse and top buggy, driven by the latter. They reached Fulton about 6 o'clock, stopped at a hotel, and remained there until a quarter after 8 o'clock that evening. The road that they took in returning was through Cayuga street, and crosses the tracks of the New York, Ontario & Western Railroad at right angles. As they approached the crossing, the view of the deceased and his companion was obstructed by a block of buildings on the southerly side of Cayuga street, so that an approaching train could not be seen until they reached a point about 30 feet westerly from the center of the crossing, where the engine could be seen at about 159 feet from the same center; and when at 25 feet from the crossing it could be seen, if they looked, at a distance of 1,275 feet. It appears that at the time of the accident the night was dark, and the electric lights were not burning on the street; that there was a great deal of commotion at the crossing, and a large crowd of people had assembled at the depot and crossing; that there was noise from the pavements, made by horses and wagons, and the Salvation Army band was near by, playing and singing. The automatic gong or signal which rung when trains approached this crossing was not in working order, and did not sound an alarm upon the occasion when this accident occurred. It also appears from the testimony that the schedule time for making the distance between the two stations was but three minutes, which included starts and stops, and that the train went some 400 feet after the air brakes were applied. The engineer testified that a train going 5 miles an hour could be stopped within 100 feet. The baggage man testified that the train stopped so suddenly that it tipped him over. All of this

testimony indicates that the train was running at a high rate of speed.

It is urged on behalf of the defendant that plaintiff should have been nonsuited on account of the intestate's own carelessness, for the reason that the place where he looked both ways was about 25 or 30 feet from the tracks, and at that point his view of the approaching train was obstructed by the buildings on the southwest corner of Cayuga street, and that, if he had looked again to the south before reaching the tracks, he would have seen the train. It appears that the intestate and his companion did look both ways as they approached the tracks. They looked first to the south, and then to the north, and when they again looked south the train was upon them. It cannot be held, as a matter of law, that it was the duty of the deceased to have been more vigilant in looking to the south. The noise at the crossing may have attracted his attention for a few seconds. The silence of the automatic signal was an implied invitation to the deceased and his companion to cross the tracks. They had a right to consider it as safe to cross as if a gate had been opened, or a flagman had signaled them to cross over. It may not have been the defendant's duty to repair the signal, but when defendant discovered that it was not in repair, and that it did not warn those who had occasion to cross the tracks that a train was approaching, it became defendant's duty to exercise greater care and caution in running its trains over the crossing. When the surroundings render a crossing dangerous to travelers on the highway, on account of obstructions to the view, or the failure of an automatic signal to work, or the removal of a flagman or gate tender, it is the duty of the railroad company to take precautions commensurate to the danger, and it is for the jury to determine whether or not the absence of any particular precaution is negligence. Glushing v. Sharp, 96 N. Y. 676.

The plaintiff contends that this train was run at an unusual and dangerous rate of speed. There is no evidence that the municipal authorities had fixed the speed at which trains might run through the village, so that it was a question of fact whether, under the circumstances, the actual rate of speed that the train was running was excessive or dangerous; and that would, to some extent, depend upon whether there was anything to obstruct the view of those about to cross the tracks, and whether proper safeguards had been adopted by the railroad company to prevent accidents. The employés of the defendant and other witnesses testified that the speed of the train did not exceed 8 miles an hour. On the other hand, a number of the plaintiff's witnesses, who were standing at the crossing and at the depot, testified that when the train reached the crossing it was running at 20 or 25 miles an hour. There was such a conflict of testimony upon that point that it would have been error for the trial judge to have taken that question from the jury, even if that were the only act of negligence charged against the defendant.

It was conceded upon the trial that when the train approached the crossing neither the steam whistle was blown, nor the automatic signal sounded. Signals of some kind are usually necessary when

trains are run at a high rate of speed over crossings, especially through cities and villages. The rights of the public and the railroad company as to the use of street crossings at the point of intersection are mutual and reciprocal, and both the company and those using the highway must exercise reasonable care and caution to avoid a collision. While a railroad train, from its force and momentum, has the preference in crossing first, yet those in charge of it are required to give reasonable and timely warning, so that a person about to cross with a horse and buggy may stop and allow the train to pass. A number of plaintiff's witnesses, who were standing near the station and the crossing, testified that they observed the train as it approached the crossing, and that the bell on the engine did not ring. Others testified that they did not hear it ring. Some of the defendant's employés swore that the bell was rung, and two or three other witnesses who stood near the crossing swore that it was rung. So that upon this point there was a conflict of testimony. It was held in Henavie v. Railroad Co., 166 N. Y. 284, 59 N. E. 901, that where a witness is shown to have been in a position to hear, and testifies that he observed the engine, but did not hear the bell ring, it furnishes some evidence that the bell was not ringing; and, if he is positive that the bell was not rung, it furnishes strong evidence that the bell was not ringing. The court said:

"A railroad company which runs a locomotive rapidly, in the nighttime, upon a public street in a populous city, crossing other streets at grade, with no gate or flagman to protect the public, and without taking any precaution to warn travelers, by bell, whistle, or otherwise, except by means of its headlight, may properly be found guilty of neglecting its duty to operate its cars with the care and caution required by the circumstances."

The conflict of evidence upon the question of ringing the bell and upon the other disputed questions of fact in the case made them proper questions for the consideration of the jury, in determining whether or not the defendant was negligent, and whether the deceased exercised that degree of care and caution that a prudent man would have exercised under similar circumstances. The court could not have held, as a matter of law, that the testimony of plaintiff's witnesses was false. It was for the jury, and not the court, to determine that question. Williams v. Railroad Co., 155 N. Y. 158, 49 N. E. 672.

The negligence, if any, of the driver, who was the owner of the horse and carriage, could not be imputed to the deceased, who was not responsible for the acts of the driver, over whom he had no control. The deceased accepted an invitation to ride in the buggy with him, but the mere fact that he had no control over the horse did not relieve him from the duty of looking and listening for himself, and doing all that a careful and prudent man should do under similar circumstances.

The plaintiff's intestate was 48 years old at the time of his death. His family consisted of his wife, who was 48 years of age, and has since died, and his daughter, 21 years of age and unmarried. We think the damages awarded were not excessive. The plaintiff's intestate had accumulated some five thousand dollars, and he was

earning from one to four thousand dollars a year. These facts constitute such a reasonable expectation of a greater pecuniary benefit to the next of kin, if the deceased had lived, than the amount recovered, that we do not feel justified in reducing the amount of the judgment.

No valid exceptions were taken upon the trial. It was competent to prove the rate of speed at which the train was running by the testimony of persons of ordinary experience. This question was not one that could be answered only by experts. Salter v. Railroad Co., 59 N. Y. 632. The judgment and order appealed from should be affirmed, with costs to the respondent.

Judgment and order affirmed, with costs. All concur, except McLENNAN and WILLIAMS, JJ., who dissent.