Kulp Transportation Lines, Inc., Plaintiff, *v.* Erie Railroad Company, Defendant.

City Court of Buffalo, July 31, 1928.

**Railroads — crossing accident — action to recover property damages resulting when one of defendant s trains ran into motor truck owned by plaintiff — evidence does not establish negligence — plaintiff guilty of contributory negligence.**

A motor truck owned by the plaintiff was struck at a railroad crossing by one of defendant's trains. The evidence shows that the motor truck was proceeding at the rate of five miles per hour up grade. According to the testimony of the driver he did not observe the approaching train until it was within fifteen feet from him and that he then endeavored to cross the track in front of the train. The evidence establishes, contrary to the contention of the plaintiff, that there was a cross-arm warning sign near the tracks; that the bell at the crossing was

ringing at the time of the accident; that the engineer sounded the whistle and rang the bell on the engine, and that the driver of the plaintiff's motor truck was familiar with the crossing, since his work required him to cross and recross many times each day. While there was some obstruction of the view of the approaching train, the evidence shows that the driver of the motor truck had an unobstructed view of the track for seventy-five feet before reaching the track.

Therefore, it is clear that the defendant is not guilty of negligence either in failing to give proper warning signals or in approaching a crossing where the view of the track was obstructed to the traveling public in such a manner as to charge it with negligence.

The charge that the train was proceeding at a dangerous rate of speed, and that that fact constituted negligence is not sustained, since the most favorable testimony for the plaintiff is to the effect that the train was traveling at the rate of twenty-five miles per hour. That speed is not in and of itself negligence.

The driver of the motor truck was proceeding at the rate of five miles per hour with his truck in low gear and there is some evidence that his hearing was not good, and it appears that he was familiar with the crossing and that his view was unobstructed for some distance before reaching the crossing. Under the circumstances, therefore, the driver of the motor truck was not free from negligence, for it appears that he did not exercise the proper degree of care and caution in approaching the crossing.

ACTION to recover damages as a result of a collision between defendant's locomotive and plaintiff's truck.

*William P. Colgan,* for the plaintiff.

*Moot, Sprague, Brownell & Marcy* [*Edward B. Horning* of counsel], for the defendant.

HARTZELL, J. This is an action by plaintiff to recover from the defendant the sum of $500 damages as a result of an accident whereby a truck belonging to plaintiff and being driven by one of its employees was struck by a locomotive drawing a train of freight cars operated by the Erie Railroad Company, at the railroad crossing of the defendant company on Leavenworth street in the village of Cattaraugus, Cattaraugus county, N. Y.

The accident happened on the 31st day of July, 1922, at about two-thirty o'clock in the afternoon, on a bright, clear day. The plaintiff is a domestic corporation engaged in the trucking and carting business, with its principal office in the city of Buffalo, N. Y.

The plaintiff charges the defendant as being solely responsible for the accident, and that it was negligent in failing to properly safeguard and protect the traveling public from the danger incident to the use of the said crossing, setting forth various specifications of negligence, which may be summarized in the main as failure to provide a flagman or gates, also warning signals, at the crossing; that the crossing was obstructed; that the locomotive was operated at a high and dangerous rate of speed, without any train signals being given of its approach.

The answer of defendant puts in issue all the charges of negligence on the part of the plaintiff, and claims that the accident happened solely through the negligence of the plaintiff's driver in the operation of his truck upon the occasion in question.

At the time in question plaintiff's truck was engaged in hauling stone through the village of Cattaraugus by the way of Leavenworth street to a point beyond the crossing of the highway by the tracks of the Erie Railroad Company. The driver of the truck was B. Bastian, an elderly man, who had been so engaged for the period of one week prior to the accident, making ten trips daily over the crossing at which the accident occurred. Leavenworth street runs due west, and crosses the tracks of the railroad company at a distance of 366 feet from Jefferson street at its base, on an incline or upgrade of about 10 feet for the distance mentioned. The street has been cut through this rising slope or hill, and reaches the railroad tracks at about right angles to the same. The railroad tracks at the crossing are laid upon a roadbed also cut through the hill, running north and south. At the time of the accident the train was coming from the north, or from Bastian's right as he proceeded up the hill and towards the tracks. The train was hauling twenty cars, loaded with stone for delivery at the village at a point about one-quarter of a mile beyond the intersection. The tracks, as they approach the point of intersection where the accident occurred, are laid out on a curve, which changes to a straight line 300 or 400 feet from Leavenworth street, and crosses the same at right angles.

It appears that a portion of the hill had been removed for the erection of a house on the right side of the highway, occupied by a Mrs. Black, who was a witness at the trial on behalf of the defendant. It is claimed by plaintiff that the hill remained back of the house and continued up to the apex of the highway at the railroad crossing, which is disputed by the defendant. It is also claimed that the tracks are laid at the crossing of the highway, practically at the peak of the incline, which fact is also controverted, the defendant claiming the tracks are placed about seven feet from the brow of the highway. There is some evidence in the case, also, that since the accident a portion of the hill has been removed, although it is contested on defendant's part by the claim that no substantial change has been made in the physical situation from that which existed at the time of the accident.

I shall attempt to briefly review the evidence and the law relating thereto. The plaintiff's driver testifies that, as he proceeded along Leavenworth street upon the occasion in question, he saw a sign by the roadside placed by the railroad company, three hundred and thirty feet from the crossing, warning persons using the highway of

the existence of the railroad crossing ahead, which sign is known as a disk sign. He also stated that he did not see a sign, known as a cross-arm sign, with like warning, placed at the top of the hill before reaching the tracks, claimed by defendant to have been there. As he approached the tracks the driver testified that he was moving at five miles per hour, in low gear, and that he looked to his right from time to time as he proceeded up the highway, but did not see or hear the train. He also testifies that he did not hear any whistle blown or bell rung. Having looked to the right from time to time as he proceeded up the highway, and not seeing or hearing the approaching train, he further testifies that he arrived at a point three feet from the tracks, when he first observed the train only fifteen feet away. He places the speed of the train at twenty to twenty-five miles per hour. He testifies that, seeing the train fifteen feet away and when he himself was three feet from the track, he then increased his speed and, reaching the tracks, was struck by the oncoming train.

The driver claims his view of the track was obscured by the hill on the right side of the highway. The witness testifies that the bank of the cut came to within ten or twelve feet of the right side of the road, and increasing in height to some thirty or thirty-five feet at or near the apex of the ascent, and that the house of Mrs. Black also shut off his view to the right. The house of Mrs. Black has been removed since the accident, and also a portion of the hill, for the purpose of a new switch adjacent to the crossing.

It further appears that at the time of the accident a young lady, fifteen years of age, Miss Meyer, a resident of the village, was riding upon the truck and sitting with the driver. She also testifies that she did not hear the whistle blown or the bell rung; that the view along the track in the direction of the approaching train was obscured by the hill and the house. Mrs. Meyer, her mother, also sworn as a witness for the plaintiff, supports her generally, except that she places the hill as being about fifty to sixty feet to the right of the highway, and also that there was no bank between the house and the tracks.

Section 53-a of the Railroad Law (as added by Laws of 1919, chap. 438) provides that " every municipality * * * shall install and maintain an approach warning sign " at a distance " not less than three hundred feet " from a grade crossing. Also in reference to signs at crossings section 53 of the Railroad Law (as amd. by Laws of 1924, chap. 395) provides as follows: " Every railroad corporation shall cause a sign board to be placed, well supported and constantly maintained, at every crossing where its road is crossed by a public highway at grade."

It appears that, in addition to the disk sign at the foot of Leavenworth street, referred to above and admitted by plaintiff's driver, it is clearly established that a cross-arm signal was also in place at the crossing at the point of intersection before reaching the tracks. The plaintiff's driver states he did not see it, while defendant, on the other hand, produced seven witnesses, four employees, two former employees, but now engaged in other lines of business, and one other witness, at no time connected with the company, all of whom testified that a cross-arm sign guarded the crossing at the time of the accident.

While, to my mind, it is clearly established that the two signs were in position at the time of the accident, the fact that the plaintiff's driver by his own statement admits he saw the disk sign 330 feet from the crossing, at the very time that he was driving his truck to the crossing and into collision with the oncoming train, and had passed this same crossing ten times each day for a period of a week previous to the accident, and, therefore, *knew the crossing was there at the crest of the incline, and was familiar with its location and its surroundings,* renders the finding as to the existence of the signs of less importance than it would possess in the case of one using the crossing who was a stranger to the locality, or one whose use thereof had been infrequent or casual.

In this connection it may be noted, and the learned counsel for the defendant points out, that the railroad company owed this plaintiff no duty to provide a flagman or gates at this crossing. Section 53 of the Railroad Law (as amd. by Laws of 1924, chap. 395) provides that, under certain circumstances, the company must provide a crossing flagman, gates, etc., *if ordered by the Public Service Commission.* No order to so protect this country highway crossing was introduced, and it may be assumed that none existed.

The learned counsel for the plaintiff contends that, although it is true that no duty rested upon the railroad company to maintain a flagman or gates at this crossing, yet failure to do so, considered with other circumstances, may amount to negligence, citing the case of *Houghkirk* v. *President, etc., of Delaware & Hudson Canal Co.* (92 N. Y. 219). In that case the court lays down the rule which I deem applicable to the question of there being no flagman or gates at the crossing in the instant case before this court, when it says: " A railroad company is not bound and owes no duty so to station a flagman, and negligence cannot be predicated of the omission. The fact may be proven as one of the circumstances under which the train was moved, and by which the degree of care requisite in its handling and running may be affected; so that the question never is whether there should have been a flagman, or one ought to have

been stationed at the crossing, but whether, in view of his presence or absence, the train was moved with prudence or negligence."

In reference to the claim that the automatic crossing bell failed to ring, and that neither the bell nor the whistle of the locomotive was sounded, the driver testified that the crossing bell had been ringing continuously for a week before the accident, whether a train was approaching or not. He also testified, as did his companion, Miss Meyer, that they did not hear the bell ring as they approached the crossing at the time of the accident. This is negative evidence, which is opposed by the evidence of a disinterested witness, who stood within one hundred feet of the crossing at the time of the accident, and who testified that the bell was ringing, and also by that of six members of the train crew, two of whom are no longer connected with the defendant company, who swear that the bell was ringing right after the accident, while the train was standing on the crossing.

One of the witnesses, Mr. Garrabrandt, an expert signal man for the Erie Railroad Company, having the charge and oversight of the automatic signals of the defendant company, testified that the bell could only be started at the isolated joints 1,600 feet from the crossing, and, as the engine stopped less than 400 feet down the track, it could not have reached another isolated joint to cause the ringing of the bell. This evidence was given to meet the claim of plaintiff that, if the bell was ringing after the accident, it was caused by the engine starting the same after crossing the scene of the accident, and not before. The witness demonstrated that the bell could only be started ringing at the isolated joint 1,600 feet away as the train approached the crossing, and could not be started again after the engine had passed that point or after crossing the intersection, because of an interlocking device near the bell itself. He further says, if the automatic bell is out of order, it rings all the time, not that it fails to ring. He further testifies that he tested this bell a few hours before the accident, and found it in perfect order. It may be said that the evidence shows that this same bell still guards the crossing, nearly six years after the accident.

Another case that may be cited in reference to the question of the crossing bell and the claim that it was out of repair is the case of *Phelps* v. *Erie R. R. Co.* (134 App. Div. 729, 731), which seems to me is also particularly relevant to this question involved in the case at bar. The court says: " There was no evidence from which the jury could justly conclude that the bell or gong at the crossing was out of repair and did not give reasonable warning of the approaching train. On the contrary, it appeared affirmatively that the bell was not out of order from the fact that it was ringing

when the train crossed the highway.   There was not, it is true, any direct evidence that it commenced to ring, as it ordinarily did, when a train was 1,800 feet from the crossing, but that is the only fair and reasonable conclusion to be drawn from the fact that it rung at all.   It was also shown by the evidence of two persons, who were at the crossing within two hours after the accident.   Each testified that he then heard the bell ring when a freight train and when a passenger train were approaching from the west.   I think that the facts and circumstances proven leave no rational ground for an inference that the bell did not give timely warning of the coming train.''

The evidence is that the witnesses of defendant swear positively that the bell was ringing, whereas the driver Bastian and his fifteen-year-old companion simply say that they did not hear it.   The court, in the case of *Culhane* v. *N. Y. C. & H. R. R. R. Co.* (60 N. Y. 133, 137) discusses a similar situation and in such connection says: '' As against positive, affirmative evidence by credible witnesses to the ringing of a bell or the sounding of a whistle, there must be something more than the testimony of one or more that they did not hear it, to authorize the submission of the question to the jury. It must appear that they were looking, watching and listening for it, that their attention was directed to the fact, so that the evidence will tend to some extent to prove the negative.   A mere ' I did not hear ' is entitled to no weight in the presence of affirmative evidence that the signal was given, and does not create a conflict of evidence justifying a submission of the question to the jury as one of fact.''

In view of the foregoing, the claim of plaintiff that the crossing bell was out of order and was not working at the time of the accident cannot be sustained.

Passing to the further charge of failure to give proper and adequate warnings of the approach of the train, it may be noted that the railroad company had the right of way.   (*Caledonian Insurance Co.* v. *Erie R. R. Co.*, 219 App. Div. 685.)   On the testimony of Mr. Bastian as to the speed at which he was approaching the crossing, namely, five miles per hour, the brakeman or watchman would reasonably expect the traveler approaching the crossing to stop and grant the train the right of way to which it was entitled under the law.

The plaintiff, in order to show some negligence in this respect on the part of the railroad company, must, therefore, introduce evidence that will establish the fact that the bell and whistle were not sounded, and that failure to sound them was the proximate cause of the accident.   The only evidence in relation to this subject was of a negative character, revealed in the testimony of Mr. Bastian

and Miss Meyer, who testified that they did not hear the bell rung or the whistle blown. On the part of the defendant, Mr. Tawders, the engineer, testified that he started to blow the whistle, two long blasts and two short blasts, when about six hundred feet from the crossing, and that just before blowing the whistle he started the automatic bell on the engine ringing. He is supported in this statement by Mr. Heil, the fireman, and Mr. Edmunds, the forward brakeman, who were in the cab at the time, the last two witnesses at the trial being no longer in the employ of the defendant company; also by the conductor, Mr. O'Leary; the rear brakeman, Mr. O'Kneski, and the flagman, Mr. Burr, who were in the caboose at the rear of the train, and who testified that they were waiting for and expecting the whistle signal, so that they might get ready to care for their train at the Cattaraugus station only a quarter of a mile away. They all swear they heard it — two long blasts and two short blasts, as mentioned by the engineer. Furthermore, Mrs. Black testified that she was in her garden in the rear of her home and only one hundred feet from the crossing and heard the whistle signal — two long blasts and two short blasts — before the engine reached the crossing. The weight of the evidence on the defendant's side as to the sounding of these signals so greatly surpasses that of the plaintiff that I conclude there can be no doubt that they were given as claimed by the defendant.

As against positive, affirmative evidence by credible witnesses to the ringing of a bell or the sounding of a whistle, there must be something more than the testimony of one or more that they did not hear it, to authorize the submission of the question to the jury. (*Culhane* v. *N. Y. C. & H. R. R. R. Co.*, 60 N. Y. 133, 137; *Smith* v. *N. Y. C. & H. R. R. R. Co.*, 41 App. Div. 614; *Durkee* v. *President, etc., Delaware & H. Canal Co.*, 88 Hun, 471.)

The purpose of signals is to warn persons using the crossing of the approach of the train. If the driver knows of the approach of the train, or tries to cross ahead of it, in close proximity thereto, it cannot be said that the failure to give warning signals was the proximate cause of the accident. Under such circumstances, the sole proximate cause of the accident would be the negligence of the driver in failing to accord to the train the paramount right of way to which it is entitled. In this view of the case the important question arises, therefore, whether Mr. Bastian, the driver, saw the train in time to avoid the accident in the exercise of due care. He testifies that he looked to his right when seventy-five feet from the crossing and saw nothing, and he continued to look to the right from that point until he reached a point three feet from the track before he saw the train.

The evidence in the case as to the location of the house and its surroundings, as given by the blueprint and the witnesses of the defendant, show the cut beginning behind the house, including the evidence given by the lady, Mrs. Black, who lived there, which is also supported by the witness for the plaintiff, Mrs. Meyer, who says that the hill was at least fifty or sixty feet from the highway, and that there was no hill between the frame dwelling and the track.

From this evidence the learned counsel for the defendant claims there was practically a clear situation for this distance of seventy-five feet, in which no obstructions existed that would prevent one, using reasonable care, from seeing an approaching train, and that in this view of the case the question of signals, therefore, becomes unimportant, and calls the court's attention to the case of *Pakalinsky* v. *New York Cent. & H. R. R. R. Co.* (82 N. Y. 424) wherein the court held that an engine approaching a crossing at night, having no lights, no fireman, and where no bell was rung and there was no flagman at the crossing, does not establish negligence on the part of the railroad company, if the plaintiff in attempting to cross, saw the engine's approach in time to avoid an injury, and, therefore, counsel claims the absence of signals, etc., had nothing to do with the accident.

I assume from the evidence in the case that the plaintiff's driver had practically an unobstructed view of the track for at least seventy-five feet before reaching the track if he had been using due caution, and that he could have seen the oncoming train in time to avoid the accident in the exercise of reasonable care.

The law is that, if one approaching a highway crossing looks where no obstruction exists, and does not see an approaching train, he is held in law to having seen the train. (*Swart* v. *N. Y. C. & H. R. R. R. Co.*, 81 App. Div. 402; affd., 177 N. Y. 529.) In that case the plaintiff swore that he looked when twenty-five feet from the crossing, and the evidence showed no obstruction from that point to the place of the accident at the crossing. In the course of its opinion the court says: " It cannot be that ' look ' simply means that a person with his eyes open shall turn his head in a particular direction. The word as used and understood in the decisions must mean that he ' looked ' intelligently, and in such manner that what his vision disclosed might influence his action or conduct. If the plaintiff in this case looked to the west in that sense, after passing the south end of the hedge, *he saw the approaching freight train;* saw it plainly and distinctly, because it was in full and plain view. If he did not look in the sense indicated, in law *he did not look at all* "

In the case of *Dolfini* v. *Erie R. R. Co.* (178 N. Y. 1, 4) a like

principle is laid down when the court says: " If the plaintiff looked at the point stated in his testimony, the train, at the time, must have been two or three hundred feet west of the curve and in plain sight. It is not sufficient that the plaintiff testifies that he looked but did not see. *Such a statement is incredible as a matter of law.*" (See, also, *Fiddler* v. *N. Y. C. & H. R. R. R. Co.*, 64 App. Div. 95, 100.)

Passing to the further charge of plaintiff that defendant permitted its train to approach a dangerous crossing and around the curve at said point at a high and dangerous speed, we find that the blue-print supported by witnesses of defendant shows the curve to be located about four hundred to five hundred feet away from the crossing. Under the circumstances of the case, I fail to see how such physical situation can suggest a finding of negligence in this respect. The only evidence of the plaintiff as to the speed of the train is that of the driver of the truck, who states he first observed it when only fifteen feet away, when he was but three feet from the track. He says it was moving twenty to twenty-five miles an hour. The limited opportunity afforded him for determining the speed of the train, according to his own statement, precludes the court from attaching much weight to his opinion, in the face of the testimony of the defendant's witnesses, who say the train was moving fifteen to twenty miles per hour, as it was to stop at the Cattaraugus station, one-quarter of a mile away. But, assuming the train was moving at the maximum speed given by Mr. Bastian, twenty-five miles per hour, I cannot find that such fact was negligence under the circumstances of this case. The following decisions point to this conclusion reached by the court:

In the case of *Phelps* v. *Erie R. R. Co.* (134 App. Div. 729, 731) the court says: " He [the engineer] was not bound to stop his train or diminish its speed. It was light, his train was visible, and as there was no noise or anything unusual about th s crossing calculated to prevent the whistle or the bell from being heard, he had a right to assume that the deceased and the driver would hear the alarm and stop in time to escape injury."

The court also says, in further consideration of said case: " The speed of a train over an ordinary highway crossing in the open country, be it ever so great, is not of itself a negligent act."

Passing to the question of the contributory negligence of the plaintiff, the question as to whether the crossing was obstructed, and, if so, to what extent, again assumes much importance in the matter of reaching a decision of the issues of this case. There is a sharp conflict in the evidence in relation to this important fact, not only in the oral testimony of witnesses, but in the evidence supplied by the blue-print and photographs produced by both sides of this controversy.

It will be remembered that plaintiff's driver and the girl witness testified that the right bank of the cut came to within ten or twelve feet from the right edge of the highway. This is the only evidence upon this point on the part of the plaintiff, except that of Mrs. Meyer, the mother of the young lady witness, testifying for the plaintiff, who swore that the edge of the hill was at least fifty or sixty feet from the right-hand side of the highway. On the defendant's part, seven witnesses swore that it began from one hundred and fifty to two hundred feet away from the right edge of the roadway, and that it did not reach a height of twenty feet until it reached a point at least one hundred feet from the point of beginning. All swore there had been no appreciable change in this hill since the time of the accident. The physical conditions were exemplified by the blueprint of the situation, prepared by the witness Mr. Roberts, civil engineer for the defendant company, referred to above, introduced in evidence, which shows the hill as beginning gradually behind the house and one hundred and twenty feet from the right edge of the highway.

All of defendant's witnesses and Mrs. Meyer, for plaintiff, swear that there was no bank between the house and the track. Mrs. Black, who lived in the house, and all the witnesses for defendant, swore that she had a level garden back of her house, in the place where Mr. Bastian and his girl companion claimed the hill existed.

But, assuming that the hill was twelve feet away, as the truck driver, Mr. Bastian says, the learned counsel for the defendant points out that the defendant was under no duty to remove it, and in the absence of such duty no negligence of defendant can be predicated thereon, but that the only question arising in such a situation is the one of plaintiff's contributory negligence

The learned counsel for the plaintiff, on the other hand, contends that, if the hill was but twelve feet from the edge of the highway, as plaintiff claims, that fact is to be considered upon the question of defendant's negligence, and that it was obligated to use greater care and diligence to operate its train in a safe and reasonable manner than if the hill were differently situated. The point is clear as to the law applicable to this situation. It naturally and necessarily involves both the question of the negligence of the defendant and that of the contributory negligence of the plaintiff. This may be illustrated by the case of *Flanagan* v. *N. Y. C. & H. R. R. R. Co.* (70 App. Div. 505, 508), bearing on the question of defendant's negligence, wherein the court says: " When the surroundings render a crossing dangerous to travelers on the highway on account of obstructions to the view, * * * it is the duty of the railroad company to take precautions * * * and it is for the jury

to determine whether or not the absence of any particular precaution is negligence."

Involving the same point, also, is the case of *Weber* v. *N. Y. C. & H. R. R. R. Co.* (58 N. Y. 451).

I am of the opinion that the duty rests alike upon plaintiff and defendant to exercise due care commensurate with the situation existing, which rule is clearly pointed out in the further case of *Wilds* v. *Hudson River R. R. Co.* (29 N. Y. 315, 327), wherein the court says: " A crossing can rarely, if ever, be so situated as to render it impossible or difficult for a traveler to observe the track on each side for a sufficient distance to determine whether it is safe to proceed. If such localities exist, they should not be crossed at all; and it would be equally imprudent in the company to tolerate them, and in the passenger to use the crossing."

The driver Bastian's testimony of the nature of the hill, its location and height, and where the bank stopped, is based upon recollection of six years ago. It is in conflict with the testimony of Mrs. Meyer, a cowitness for the plaintiff, who was a resident of Cattaraugus for many years and was familiar with the location; also with that of Mrs. Black who lived right on the spot where the hill is claimed to have been and cultivated a garden there on level land, and also with that of the witnesses of defendant who testified on that subject. Taking Mrs. Meyer's statement that the hill was fifty to sixty feet from the highway as a fact, it appears that there is a clear view of five hundred and fifty feet up the track, when the driver is fifty feet from the crossing, as measured on the blueprint with a ruler, and if the claim of the driver, Bastian, is correct that the hill is only twelve feet from the edge of the highway, he could have a view of the track for four hundred and sixty-seven feet when at a point twenty-five feet from the place of the accident.

In the recent case of *Cassidy* v. *Fonda, J. & G. R. R. Co.* (200 App. Div. 241; affd., 234 N. Y. 599) the court held a truck driver guilty of contributory negligence as a matter of law when he had only twenty feet in which to look.

Continuing the illustration as to the question of plaintiff's contributory negligence, the following excerpt may be quoted from the court's opinion in the case of *Wilds* v. *Hudson River R. R. Co.* (29 N. Y. 315, 328): " If the case is such as to require the person wishing to cross to come near the track to make his observation, that circumstance, so far from excusing him from the duty of looking at all, would only render that duty more imperative, if he would avoid the imputation of negligence."

Another case in point is that of *Mackey* v. *New York Cent. R. R. Co.* (27 Barb. 528, 541). In that case plaintiffs' intestate was killed

at a railroad crossing of defendant company, where wood was piled for many rods from the crossing, on the sides of the railroad track westward, so as to obscure the view of a person at the crossing.

In sustaining exceptions to the charge to the jury in the court below, which stated that the situation of the wood could only be regarded in considering the obligation of the defendant to provide with greater care against accidents, and also that it contained a statement from which the jury might infer that the wood pile gave an excuse for plaintiff's intestate to drive heedlessly upon the tracks, and in setting aside the verdict for plaintiff below on account thereof, the court says: " *The plaintiff was not a stranger there.*   *   *   * It seems to me that it was the height of imprudence and heedlessness for a man, with such knowledge, to approach and attempt to cross a railroad track about the time a train was due, till he had fully ascertained that it was entirely safe to do so; and that the fact of the location of this wood pile, perfectly well known to him, does not diminish his duty to be careful, in the slightest degree." But " rather, in my opinion, did it increase his duty to greater carefulness. *   ·   *   *   I hold that he was bound to exercise care and diligence and foresight in proportion to the danger to be avoided, and the fatal consequences involved in his neglect.   His vigilance should be quickened, not slackened, by the fact that he could not see the track sidewise, to any distance, till he got right on to it.   He was bound to act as a prudent rational man in view of the surrounding circumstances; and no prudent man would drive heedlessly upon a railroad, and attempt to cross its track, till he had actually and fully ascertained that the track was clear, and that there was no danger."

Hence the rule is well established that it is the duty of the traveler approaching a railroad crossing, before he passes over the same, to exercise a proper degree of care and caution, and to make a vigilant use of his eyes and ears, to ascertain whether a train is approaching, and if by a proper use of his faculties he should have discovered the train and escaped injury, and fails to do so, he is chargeable with contributory negligence and cannot recover. (*Salter* v. *Utica & B. R. R. R. Co.*, 75 N. Y. 273, 276; *Tolman* v. *Syracuse, B. & N. Y. R. R. Co.*, 98 id. 198, 202; *Brickell* v. *New York Cent. & H. R. R. R. Co.*, 120 id. 290, 293; *Avery* v. *New York, O. & W. R. Co.*, 205 id. 502, 507.)   In the last-mentioned case the court says: " But he must approach with ordinary care and with horse, or wheel, under such complete control, as to permit of stopping within a reasonable time, if by so doing injury could be averted."

The exercise of due vigilance upon the part of a traveler approaching a railroad crossing imposes upon him the necessity of using his

53

eyes and ears for the purpose of seeing and hearing the approach of a train, and with senses alert to the possibility of approaching danger. What is the explanation for the failure of the driver, Bastian, to see a freight train of twenty cars until it was fifteen feet away from him, and until he was three feet from the track? He says the bank and the house obstructed his view. The disparity between this statement of plaintiff and the claim of defendant is, manifest.

In answer to this claim, the evidence of the blueprint alone, which is also supported by defendant's witnesses, shows that the house in question presented no real obstacle, and that there was a view of the track for a distance of two hundred feet, except for a space of about, twenty-five feet when the driver was directly in front of the house. It also may be noted that the surveyor's map simply records the distance that a surveyor's measuring pole can be seen while on the railroad track. The difference of the impression that would be made upon the human vision by a freight train of twenty cars and a mere surveyor's pole, at any given distance on the track, is emphasized by the court's opinion in the case of *Swart* v. *N. Y. C. & H. R. R. R. Co.* (81 App. Div. 402, 404) when it says: " Of course, a train composed of an engine and * * * cars, if upon such * * * railroad, could be seen * * * more distinctly than the roadbed."

As has been seen, taking the driver's statement that the bank was but twelve feet away from the roadside, the measurements reveal that he could see along the track four hundred and sixty-seven feet when twenty-five feet from the point of the accident. In the recent case of *Cassidy* v. *Fonda, J. & G. R. R. Co.* (200 App. Div. 241; affd., 234 N. Y. 599) the court held the driver guilty of contributory negligence, saying: " It was the duty of the plaintiff's intestate, not merely to look for cars by turning his head and eyes to the west at places upon his journey where he had no westerly vision, but to do his looking at a time when looking would be of service. From the freight car easterly to the angle in the roadway the intestate was wholly deprived of a westerly vision. When his truck had made the angle and was headed in a northerly direction there was a space of twenty feet to the east-bound rail, less the distance necessary for the truck to make the turn, in traveling which an uninterrupted vision to the west of more than five hundred feet was available. Unless the intestate looked while traveling through this open space he was guilty of contributory negligence."

Another citation of value to the question under consideration is that of *Barry* v. *Rutland R. R. Co.* (203 App. Div. 287, 288) wherein the court says: " The deceased was sitting in the front seat of the

wagon and for a distance of more than twenty feet after he passed the bushes and before his horse had reached the first railroad track, the train was within his plain sight.   The horse was moving slowly, either walking or jogging along, just before he was struck and, when his horse was going upon the track, he was seen to pull up short with his reins and was instantly struck. * * * The deceased had plenty of time to look and stop his horse in time to avoid the accident."

The similarity of the *Barry* case to the instant case before the court is apparent.   The driver in each case failed to look for or heed the approaching train, and if Bastian had looked, or had used due caution in approaching the tracks, he had plenty of time to stop his truck before going upon the track, and avoid the accident, in any view of the circumstances of this case.

In this connection, reference may be made to the matter of signals as bearing upon the question of the driver's contributory negligence in relation to failing to hear as well as see the approaching train.   At the time of the trial Bastian was extremely deaf.   His examination was conducted by counsel with the greatest difficulty. He claims that such infirmity has arisen since the accident, although various witnesses for the defendant testified that they observed the same condition of deafness at the time of the accident.   He and his young companion say that " they did not hear " the noise of the train, the ringing of the electric bell on the engine, or the two long and two short blasts of the whistle.   What explanation can be offered that all these signs of the approaching train were not heard by the driver and his companion?   Certainly it cannot be said, in the face of all the evidence to the contrary, that they were not given. Even the noise of the heavy train of twenty loaded cars on an upgrade when several hundred feet from the crossing could not escape the attention of a traveler, who was using only the common conditions of ordinary care, and was in possession of his normal faculties.

The driver testified that he was driving his truck on an upgrade in low gear, and was seated with a canopy over his head.   In addition to the claim that the signals were not given by the defendant, the plaintiff advances the proposition that the noise of the truck traveling in low gear prevented the driver, seated under a canopy, from hearing the same.   Whether the failure of the driver to hear the train, and the signals of its approach, was due to these facts, as claimed by plaintiff, or to deafness, or inattention, as the defendant contends, the same result is reached, in that the responsibility for such failure rests upon the plaintiff alone.   In this respect the instant case seems to fall within the language of the court's decision

in the case of *Bowden* v. *Lehigh Valley R. R. Co.* (178 App. Div. 413, 418) where the court says: " If plaintiff did not hear them, as he says, his failure to hear can only be explained on the theory that his hearing was defective or that the noise of his motorcycle prevented. There was some noise and shouting by thĕ boys who had been playing ball at about the time the whistle was blown for one of the crossings, but this did not prevent all the witnesses who were in the immediate vicinity of these boys and the boys themselves from hearing the whistle. The railroad company was not required to anticipate that the plaintiff would not hear signals, because he was riding upon a noisy machine or because his hearing was defective. Adequate signals are such as can be heard by persons who are listening attentively, whose hearing is unimpaired and who are not themselves making so much noise as to prevent hearing the signals which are customarily given at railroad crossings. No traveler on the highway expects to hear any other signals at the ordinary country crossing than those given by whistle or by bell or by both. He knows, or should know, that if the noise of his vehicle will prevent his hearing these customary signals then he will be without warning and should govern himself accordingly. Railroad companies are not required by law to anticipate that a traveler so situated that he cannot hear the customary signals because of the noise of the machine he is riding will proceed onto a crossing without taking such other precautions as an ordinarily prudent man would deem necessary or his safety."

I am of the opinion, and so find, from my consideration of all the facts and circumstances of the case, as revealed by the evidence herein, that the warning signals were in working order and were duly given as the defendant's train approached the crossing at Leavenworth street; that the crossing bell was ringing, as well as the automatic bell upon the engine, and the whistle was blown two long blasts and two short blasts; that, in addition to the disk sign three hundred and thirty feet east of the crossing on Leavenworth street giving warning of the railroad crossing ahead, there was also a cross-arm sign at the top of the incline before reaching the crossing; that the tracks were not immediately at the brow of the highway but were properly and safely laid out through the roadbed at some six or seven feet from the peak thereof; that the absence of gates or flagman at the crossing violates no duty, and that no negligence can be predicated thereon; that the curve upon which the train reached the crossing was so remote in distance that it in no manner contributed to the accident; that the speed of the train was from fifteen to twenty miles per hour, and was safe and proper, and in no manner suggests a lack of due care in its operation upon that

occasion; that there was no obstruction by the hill or slope of the land, or by the aforementioned house, or otherwise, that would have prevented this plaintiff's driver, or any person approaching the crossing on Leavenworth street, from having a clear view of the tracks and the approaching train upon the occasion of the accident; and that there has been no material change in conditions since the accident.

I, therefore, find that the plaintiff has failed to establish the charge that the defendant was negligent in failing to properly safeguard and protect the traveling public from the danger incident to using the said crossing, and has failed likewise in proof of all specifications thereof aforesaid.

I further find that the plaintiff's driver heedlessly drove upon the track without looking or listening for the oncoming train, and without exercising due care for his safety in determining that the way was clear for him to make the crossing, before proceeding to pass over the same, and also, in this connection, that, if the plaintiff's driver drove across the track in front of the approaching train when only fifteen feet away, as claimed by him, such act was negligent. *He was familiar with the crossing and the conditions there existing.* According to his own statement he had passed over the crossing on the same route ten times a day for the period of a week previous to the accident. He had, therefore, passed over the crossing one hundred and forty times. He knew, according to his own claim, that the crossing was obscured, and that he had no view to the north until he was three feet from the track. And, notwithstanding this knowledge, he drove up to within three feet of the totally obscured track, as claimed by him, without the exercise of any precautions on his part, either to see or hear if there was an approaching train, and that the way was clear to afford him a passage in safety, and, seeing the approaching train only fifteen feet away, did not stop or endeavor to stop his truck, but increased his speed and reached the track just in time to be struck by the locomotive, all of which shows a reckless disregard of the duty the law imposes upon him to exercise that due care for his own safety commensurate with the conditions he knew to exist. It may be noted in passing that the facts and circumstances of the instant case, either as claimed by the plaintiff or by the defendant, do not reveal a situation where a person is suddenly met with an unexpected emergency and errs in judgment in endeavoring to escape from impending danger.

In view of the foregoing, I find that no negligent act or omission which was a proximate cause of the accident was proved against the defendant under the pleadings, and that the plaintiff's agent was

guilty of contributory negligence, both as a matter of fact and of law, and his negligence not only contributed to, but was the sole cause of, the accident, and his negligence bars this plaintiff's recovery.

Judgment is, therefore, rendered in favor of defendant and against the plaintiff of no cause of action, dismissing plaintiff's complaint upon the merits, together with the costs of this action.