INCRET, Respondent, v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellant.

(No. 7,792.)

(Submitted October 1, 1938.   Decided December 27, 1938.)

[86 Pac. (2d) 12.]

*Messrs. Murphy & Whitlock,* for Appellant, submitted a brief on the original hearing and one on rehearing; *Mr. Edmund T. Fritz,* of Counsel, argued the cause orally.

398

400

*Messrs. W. E. Coyle, H. L. Maury* and *A. G. Shone,* for Respondent, submitted a brief at the original hearing, and a supplemental one on rehearing; *Mr. Coyle* argued the cause orally on the original hearing, and he and *Mr. Shone* on rehearing.

402

MR. JUSTICE MORRIS delivered the opinion of the court.

December 31, 1936, Fred McGovern drove in a Ford V8 coupe to the home of the plaintiff, where the plaintiff joined him, and the two started to drive to the home of a third party. The route lay along South Montana Street, which appears to be the boundary line between the county and the city limits of the city of Butte. They approached the point where the defendant's railway line crosses South Montana Street from the north. At a point approximately 300 feet north of the railway line a stop railroad signal is located at the right side of the highway. Approximately 40 feet from the north rail of the railway line an arc light is located, suspended 20 feet in the air, hanging directly over the street. This light is of the same style and candle power as some five or six hundred lights that are in use throughout the city of Butte at street intersections. Crossing gates that can be lowered and raised are installed on either side of the railway line at the intersection of the railway line and Montana Street—one on each side of the street—and, as they are lowered from either side, they form a barrier to highway traffic. .It had been the practice to keep a red light hung on the gates when lowered, to warn travelers on the highway of approaching trains. At the time of the accident the gates appear to have been frozen and were not in use. Just to the left of the street and opposite the north gates defendant's crossing watchman had his station in a small shack when approaching railway traffic did not require his presence in the center of the highway.

It appears from the testimony that in ample time to give warning of the approaching train at the time of the accident the watchman took his place in the center of the street and waved on the north side of the railway crossing—the side the car in which the plaintiff was riding approached the crossing—his red lantern backwards and forwards. McGovern and the plaintiff suddenly appeared on the highway about 9:15 in the evening and crashed into defendant's freight train approximately 2,000 feet in length, striking the train about the center. They approached the arc light, according to the testimony of the driver of the car, approximately 40 feet from the railway line, at a rate of speed of 30 to 35 miles per hour, but as they passed under the arc light their speed was reduced to approximately 20 miles per hour, and they were going at that rate of speed when they struck the train.

The plaintiff was rendered unconscious; three ribs were broken; he was cut and bruised about the face and over the body generally, and was painfully but not seriously injured. He was confined in the hospital for about 30 days in all. He was in the hospital from the time of the accident until January 8, released on that date but returned later and stayed there for a time on account of an infection of a cut on the knee which was suffered at the time of the accident. He was of good physique and was able to go to work in three months' time.

The complaint alleges the crossing to be dangerous, and plaintiff predicates his right to recover upon the negligence of the railway company in permitting the gates that were usually operated at the crossing to become out of condition, and failure to take other means to warn highway traffic of the danger at the crossing. Failure to operate the gates clearly appears to be the chief ground on which the allegations of injury due to the negligence of defendant are founded. A map showing the physical conditions surrounding the crossing was introduced and received in evidence without objection and explained by the drafting engineer who was called as a witness.

A general demurrer to the complaint was overruled. The answer denies all the material allegations of the complaint, and, as an affirmative defense, alleges that plaintiff's injuries were due to the contributory negligence of the driver and the plaintiff. The matter was tried by the court sitting with a jury. At the beginning of the hearing the defendant objected to the introduction of any evidence on the ground that the complaint did not state a cause of action. The objection was overruled. When plaintiff rested, the defendant moved for a directed verdict, which was overruled. A motion for a new trial was likewise overruled. The matter is here on appeal from the judgment.

Twenty-two specifications of error are assigned. We are of the opinion that the merits of the controversy turn upon the question whether or not the driver of the car and the plaintiff were guilty of contributory negligence or not, and that the solution of that question will render unnecessary the consideration of the assignments of error in detail.

McGovern, as a witness for the plaintiff, testified that he was about 30 or 40 feet north of the crossing when he first saw the train. He was almost directly under the arc light, and before that he had looked and he thought he had a clear road. He "did not see any obstruction thereof." He testified there was no light and no danger signal of any kind that he saw; the gates were not working and he had no warning that there was a train on the highway crossing. He was familiar with the crossing and had been over it some ten times or more. When he approached the intersection of South Montana Street and Rowe Road he knew that there was a crossing a little beyond but had never driven over the crossing when a train was there. He was listening, but could not hear anything, so he imagined it was clear. His car was in good condition as to brakes and head lights, and he was driving around 30 miles per hour—"maybe a little more" when he left the intersection of Montana Street and Rowe Road some 300 feet north of the crossing.

Later he stated that when he left the intersection he "was doing around between 30 and 35 miles per hour." He did not know how fast he was going when he struck the side of the train, "but it was around 20 miles." He could stop a car going 30 miles an hour in 30, 35 or 40 feet, and could stop one going 20 miles an hour in less distance. "But the road conditions at the crossing were such as to make it impossible to stop as quickly as 35 or 40 feet." Under the conditions he believed it would take 70 or 80 feet. He further testified: "If there was sufficient warning there I would have stopped and not been going that fast. Assuming that I was able to see the train at a distance of 70 feet from the crossing, my estimate is, under the conditions as they were then, I could have stopped in time to have avoided the collision. * * * I expected to see a red light. * * * I could not see the gates standing in their ordinary upright position until I had gotten under the arc light and my head lights hit the train. Prior to the time I had gotten under the arc light I could not see where the crossing gates were. If they had been down and there had been no red light on it I would have seen it. * * * When I first noticed the train I applied my brakes. The wheels skidded and the car hit toward the street car tracks. * * * While I was passing from underneath the street light up to the place where the train was, I saw the crossing watchman over there talking to people on the sidewalk. I glanced over toward him. The windshield was slightly frosted. I couldn't say how cold it was that night, but it was pretty cold. It was below zero."

The witness denied that he had said in the presence of Matt Korn and Father Hannah, at St. James' Hospital, that the reason he ran into the train was because his "windshield was frosted over." He said he never made that particular statement, but that his windshield was slightly frosted but that he could see. He further testified that he was looking for the red light and did not look to either side to see if a train were coming, or anything of that kind. "If the gates had been down with the red lights burning, I would not have speeded up my

car as I did * * * as I approached the crossing. My window was down three or four inches and I was listening and heard nothing. As I approached the crossing, I did not look to either one side or the other before * * * I was proceeding on the right hand side of the street going down and there was nobody out and waving any light and there was no light out there."

The pertinent part of plaintiff's own testimony relative to whether the crossing was hazardous or not, his familiarity with the crossing and his exercise of due care, was as follows:

"You couldn't see the railroad track, and you couldn't see the train approaching in either direction until you got underneath the arc light. When we got underneath the arc light, I then looked to the left and saw that a train was coming; I looked to the right and saw that a train was coming. I looked before I got to the arc light too,—just after you get over the Rowe Road there is a railroad track there, and looked and didn't see anything. I looked because I knew a track was there. If a train was there I would not have been able to see it, but I looked. I realized that at the time. As I approached the crossing I realized that I would not be able to see whether a train were approaching the crossing or whether a train were on it until I got under the arc light. * * *

"I am familiar with the general lay-out of that crossing there as I have been over it quite a few times. There are not buildings all around it. There is nothing at all on the right-hand side, or west side of the crossing that I know of. The ground is level all around there. On the east side of the crossing beside the watchman's shanty there is a little gas station and a few shacks and that sandwich place, Matt Korn's place. The gas station is up at the intersection of Rowe Road and Montana Street.

"I would say it was rather chilly that night. It ain't cold at zero in my estimation. I would say it was around zero. There was a little snow on the ground but not enough to cover it; it was in spots. The highway seemed all right; there was

a little snow on it. As we left the intersection at Rowe Road and Montana Street and drove on down toward the crossing I do not recall that I said anything to Mr. McGovern or that he said anything to me; didn't say anything to him about the crossing we were coming to or anything like that. At that time I was sitting beside him. * * *

"Naturally you would look when you know there is a crossing there. I was endeavoring to make the best observations I could to see whether or not there was a train there. A train was there but I did not see it. If it were visible I would have seen it. If I had seen it I would have told Mr. McGovern that there was a train there. It was not until I got under the arc light that I was able to make any observations that would disclose to me the presence of the train as it passed over the crossing. I was not able to see a train passing over the crossing until I got that close. The arc light coming down creates a sort of light there so that you cannot see beyond it. I am familiar with the crossing itself and the conditions around there. The arc light as it shone down on the street there prevented me seeing the track and the train on it. That condition has been that way a long time I guess. I just noted it that night and did not notice it before that. I had been up there at night before that and it had been the same way, I could not see the tracks until I got under the arc light. It had been the same way previous times I went over the crossing and I imagine it had been that way for several years."

The engineer on the train testified the whistle was blown several times as the train approached the crossing and at the crossing where the accident occurred. The last blast of the whistle, according to practice, is usually given as the engine goes on the crossing. The bell is not rung nor the whistle blown after the crossing is passed. As the engine passed over the crossing he saw the watchman at his usual place with a red light. He further testified: "I should judge that we were about 150 feet back from the crossing when I first saw the watchman, the flagman, in the street; at that time he was out in the middle of the

street swinging his lantern, a red lantern, lighted. I could see the red light. As we traveled that 150 feet to the crossing, the watchman just stood there swinging his lantern all the time we were going over. I did not look back after we got over the crossing. The last time I saw the flagman he was standing right in the middle of the track where he had been all the time."

The rear brakeman, Sam Brand, testified in substance for the plaintiff that he had gone forward at the Butte yard from the rear of the train, which was his station, and was riding by the side of the engineer until the crossing was passed. As they approached the crossing he heard the bell ring and the whistle blow, and saw the flagman out on the crossing, swinging his red lantern, giving the stop signal. The flagman was in the middle of the street. Brand said, "He was swinging the lantern, a stop signal, this way (illustrating); that is from side to side with a sort of half arc. As we approached the crossing he continued to make that signal and he was still swinging it the last I saw him when we crossed and we were then just over the road crossing, the last I saw him with the lantern, and you go outside as you go over and you pay no further attention to him after that." Brand further testified that the train, electrically driven, was traveling eight or ten miles per hour and that there were 50 or 60 cars in the train. This would make the train approximately 2,000 feet in length.

The watchman testified that he gave the stop signal until the motor got over the street, and then moved back and was watching the train with the lantern in his hand and he had turned and was facing south, but the lantern could be seen up Montana Street toward Rowe Road. The car hit the train about the middle.

The witnesses Murphy and Holland, friends who were visiting the watchman just prior to the approach of the train, and who followed the watchman out and stood at the side of the street when the train was passing, corroborated the testimony of the watchman in all material points relative to the signals given.

At this point we think it important to consider the following obvious facts: The train, according to uncontradicted testimony, was traveling approximately ten miles per hour, and hence would travel 1,000 feet in 1 3/22ths of a minute. The automobile traveling 30 miles per hour would travel half a mile in a minute, or 2,640 feet. Hence, while the train consumed 1 3/22ths minutes of time traveling 1,000 feet, during the same time the automobile would travel approximately 3,000 feet. The automobile struck a 2,000-foot train near the center. It then becomes quite clear that when the train motor passed over the crossing, the automobile was 3,000 feet away. This leaves the testimony of the train crew unimpeached as to the ringing of the bell, the blowing of the whistle and the waving of the red lantern by the watchman, as McGovern and the plaintiff were too far away to see or hear such signals at the time the motor of the train passed the crossing. The testimony of the train crew was substantially corroborated by the testimony of the watchman and witnesses Murphy and Holland, and could not be impeached by testimony of witnesses who by their own testimony were 3,000 feet or more than half a mile from the scene when the accident occurred when the train reached the crossing.

This brings us under the rule that when a train is on or passing over a crossing, that in itself is to the traveling public sufficient warning unless the crossing be extrahazardous, and that this crossing was not extrahazardous is clear from the testimony of McGovern and the plaintiff, and as shown by the map heretofore mentioned—Defendant's Exhibit 1.

It must be kept in mind that railway trains have the right of way over their own railway lines and may run their trains at will, being responsible for due care to protect the lives and property of others. (*Gray* v. *Pennsylvania R. Co.*, 3 W. W. Harr. (Del.) 450, 139 Atl. 66; *Sisson* v. *Southern Ry. Co.*, 62 App. D. C. 356, 68 Fed. (2d) 403; *Atlantic Coast Line R. Co.* v. *Watkins*, 97 Fla. 350, 121 So. 95; *Seaboard Air Line Ry. Co.* v. *Watson*, 287 U. S. 86, 53 Sup. Ct. 32, 77 L. Ed. 180, 86 A. L. R. 174; *Franks* v. *Baltimore & O. S. W. R. Co.*, 269 Ill.

App. 129; *New York C. R. Co.* v. *De Leury,* 100 Ind. App. 140, 192 N. E. 125; *Lenning* v. *Des Moines & C. I. R. R.,* 209 Iowa, 890, 227 N. W. 828; *Pearce* v. *Missouri Pac. R. Co.,* (La. App.) 143 So. 547; *Richard* v. *Maine Cent. R. Co.,* 132 Me. 197, 168 Atl. 811; *Klein* v. *United R. & E. Co.,* 152 Md. 492, 137 Atl. 306; *Caledonian Ins. Co.* v. *Erie R. Co.,* 219 App. Div. 685, 220 N. Y. Supp. 705; *Lee* v. *Pennsylvania R. Co.,* 269 N. Y. 53, 198 N. E. 629; *Pippy* v. *Oregon Short L. R. Co.,* 79 Utah, 439, 11 Pac. (2d) 305; *Norfolk & W. R. Co.* v. *Benton,* 160 Va. 633, 169 S. E. 560; *Spokane County* v. *Great N. Ry. Co.,* 178 Wash. 389, 35 Pac. (2d) 1.)

One of the highest obligations of railroad operators is to ▮ protect the public at highway crossings, but watchmen and warning devices are required by law and installed for the primary purpose of warning the traveling public of approaching trains or cars, but the absence of such warning devices does not excuse the negligence of the highway traveler who is charged with reasonable care in the premises. (See sec. 3842, Rev. Codes; *Jarvella* v. *Northern Pac. Ry. Co.,* 101 Mont. 102, 53 Pac. (2d) 446; *Schmidt* v. *Chicago & N. W. Ry. Co.,* 191 Wis. 184, 210 N. W. 370; *Olson* v. *Chicago G. W. Ry. Co.,* 193 Minn. 533, 259 N. W. 70; *Morley* v. *Cleveland, C., C. & St. L. R. Co.,* 100 Ind. App. 515, 194 N. E. 806; *Ullrich* v. *Columbia & C. R. Co.,* 189 Wash. 668, 66 Pac. (2d) 853; *Dunlap* v. *Pacific El. Ry. Co.,* 12 Cal. App. (2d) 473, 55 Pac. (2d) 894; *Missouri Pac. Ry. Co.* v. *Price,* 182 Ark. 801, 33 S. W. (2d) 366, and numerous cases cited in note beginning at page 1454, 99 A. L. R.

The rule is clearly expressed in *Schmidt* v. *Chicago & N. W. Ry. Co.,* supra, where it was said: "It appears that the railroad company had voluntarily installed at this crossing an electric alarm bell and an electric wigwag to signal the approach of trains to this crossing. The jury found that the banner of the signal device failed to swing, that the bell of said signal device failed to ring, and that the light of said signal device failed to burn just prior to the time plaintiff was injured. These are the only facts relied upon to convict the company of negligence

constituting the proximate cause of plaintiff's injuries. While it may be conceded that these various signal devices were not working properly, we are confronted with the fact that the train was actually and physically upon and passing over the crossing at the time of the accident. It is well known that signal devices such as those in question are installed by railroad companies, sometimes voluntarily and sometimes pursuant to the requirements of law, not for the purpose of warning travelers upon the highway of the actual presence of a train upon the crossing, but for the purpose of warning them of the approach of a train. Conceding that the plaintiff and her companions in the automobile had a right to rely upon the operation of these signals to warn them of an approaching train, it by no means follows that they had any right to rely upon the operation of these signals for the purpose of warning them of the actual presence of a train passing over the crossing. It cannot be held that the railroad company should have anticipated that by reason of the defective operation of these signals plaintiff and her companions, or anyone else traveling along the highway, would collide with a freight train actually passing over the crossing. If any authority for this rather self-evident proposition be needed, the cases of *Nadasky* v. *Public Service R. Co.*, 97 N. J. L. 400, 117 Atl. 478, and *McGlauflin* v. *Boston & Maine R. R.*, 230 Mass. 431, 119 N. E. 955, L. R. A. 1918E, 790, may be cited. Because there was no negligence on the part of the railroad company which can be said to have proximately contributed to plaintiff's injuries, her complaint should have been dismissed. The granting of a new trial was therefore not only an abuse of discretion, but was due to an erroneous view of the law.''

In *Morley* v. *Cleveland, C., C. & St. L. R. Co.*, supra, it was said: ''The only act of negligence relied upon as ground for recovery was the failure of an electric gong which was maintained at the crossing to ring. In denying the plaintiff's right to recover in this case, the court said: 'Even if this appliance were maintained by the defendant because required to do so

under the authority of the statute, its purpose was to protect travelers on the highway from the danger of approaching trains, and not to warn the public against cars and engines which were standing still. * * * [Quoting from *McGlauflin* v. *Boston, etc., R. R.,* supra.]"

Both the railway company and the plaintiff were charged with that degree of care commensurate with the danger. (*Thuet* v. *Southern Pac. Co.,* 135 Cal. App. 527, 27 Pac. (2d) 910; *Kulp Transp. Lines* v. *Erie R. Co.,* 132 Misc. 821, 230 N. Y. Supp. 490; *Texas & N. O. R. Co.* v. *Stratton,* (Tex. Civ. App.) 74 S. W. (2d) 746.)

The general rule is that a train standing on or moving over a crossing is effective and adequate warning in itself without warning signals. (*Crosby* v. *Great N. Ry. Co.,* 187 Minn. 263, 245 N. W. 31.) The only exception to this rule is where, as in the *Jarvella Case* herein quoted from, there exist at or near the crossing certain conditions that obscure the view and render the crossing one where more than ordinary care is required of the railway. Such a situation also calls for a greater degree of care by the traveler who is familiar with the crossing. In the *Jarvella Case* a high slag pile and numerous buildings were located near the crossing and prevented a clear view of the railway line except the portion of the train across the highway. Furthermore, a watchman was stationed at the crossing until midnight, but not after. The fact that the railway company kept a watchman there part of the night was, in the opinion of the court, an admission that the crossing was one of more than ordinary danger. If the crossing were such that a watchman was believed necessary the first half of the night, no good reason appeared why he was not needed the last half.

The evidence here clearly shows that both the driver of the ▇ car and the plaintiff were familiar with the crossing; both regarded it as dangerous; both knew they were approaching the crossing; neither could see the railway line until the car passed the arc light, only 40 feet from the passing train; both realized that the windshield was frosted, and the pavement

was partially covered with snow and ice, and yet, possessed of all this knowledge, they recklessly plunged ahead, taking the gambler's chance, trusting to luck to get safely across. Such utter disregard of that degree of care which a prudent man exercises in the face of danger clearly determines, as a matter of law, that the negligence of McGovern and the plaintiff was the direct and proximate cause of the accident.

This court, speaking through Mr. Chief Justice Brantly, said in *Sherris* v. *Northern Pacific Ry. Co.*, 55 Mont. 189, 175 Pac. 269, 271: "Every person is bound to an absolute duty to exercise his intelligence to discover and avoid dangers that may threaten him. When, therefore, a plaintiff asserts the right of recovery on the ground of culpable negligence of the defendant, he is bound to show that he exercised his intelligence to discover and avoid the danger, which he alleges was brought about by the negligence of the defendant." (See, also, *Hughey* v. *Fergus County*, 98 Mont. 98, 37 Pac. (2d) 1035; *Fulton* v. *Chouteau County Farmers' Co.*, 98 Mont. 48, 37 Pac. (2d) 1025.)

Two ways were open to the plaintiff—one dangerous, the other safe; he could proceed without taking time to investigate and take the chance of getting over an alleged "dangerous crossing" safely, or he could have had McGovern stop the car and investigate. The dangerous course was chosen, when a moment or two in stopping would have assured safety. This was gross negligence.

This court, in *Rau* v. *Northern Pac. Ry. Co.*, 87 Mont. 521, 537, 289 Pac. 580, 584, said: "Every person is bound to an absolute duty to exercise his intelligence to discover and avoid dangers that may threaten him. * * * 'A person approaching a railroad crossing is required to take all reasonable precaution to assure himself by actual observation that there is no danger from an approaching train. * * * The rule as to the caution with which one must approach a railroad crossing in this state without being guilty of negligence has been thoroughly established, and requires a person to use his senses vigi-

lantly to determine whether or not a train is approaching, before
he goes upon the track. This requires that he use his eyes and
ears, and, if necessary to make his looking and listening rea-
sonably effective, he must stop at such point as will accomplish
that purpose.' (*Keith* v. *Great Northern Ry. Co.*, 60 Mont.
505, 199 Pac. 718.)''

It was said in *West* v. *Davis,* 71 Mont. 31, 42, 227 Pac. 41, 45:
''In the case of *Roberts* v. *Chicago, M. & St. P. Ry. Co.*, 67
Mont. 472, 216 Pac. 332, the court said: 'The rules for deter-
mining the liability for injuries resulting from collisions on
railroad crossings have been definitely established in this juris-
diction,'—and proceeds to set forth those rules to be that the
presence of a railroad track is of itself a warning of danger;
a person approaching a railroad crossing is required to take all
reasonable precautions to assure himself by actual observation
that there is no danger from an approaching train; the failure
of the persons in charge of the train to give warning signals
of its approach to the crossing does not relieve the traveler of
the necessity of making a vigilant use of his senses to ascertain
whether it is safe to proceed; the traveler must use ordinary
care to make his looking and listening reasonably effective; and
that, whenever it appears that there is a zone of safety within
which a traveler upon the highway may, by looking and listen-
ing, and stopping if need be, to ascertain the presence of an
on-coming train, it is his duty to make his observation within
such zone; if he proceeds from the place of safety regardless
of an approaching train of which he has knowledge, or if he
leaves the place of safety without having made a vigilant use
of his senses to discover a danger which is present and could
have been seen from such place, then it will be held to be his
negligence which is the proximate cause of the injury resulting
from a collision, regardless of circumstances tending to show
negligence on the part of the railroad operators. When a train
is at a point which is within the traveler's vision while he is in
a place of safety, he will be deemed either to have seen it and
proceeded regardless of the danger, or to have failed to make

a vigilant use of his senses. In such a situation the traveler is the author of the misfortune which befalls him, if he meets with injury."

Giving the plaintiff the benefit of every reasonable doubt, the conclusion that he was grossly negligent is unescapable and that such negligence was the sole and proximate cause of his injuries.

The case as presented by the plaintiff is further defective in that no weight was given by the jury to the physical facts involved; and where testimony of witnesses is in clear conflict with the physical facts pertinent to any issue, the evidence presented by established physical facts prevails. It was said in the recent case of *Guyer* v. *Pacific Elec. Ry. Co.*, 24 Cal. App. (2d) 499, 75 Pac. (2d) 550, 551: "It is the settled law of this state that, if the physical facts shown by undisputed evidence raise the inevitable inference that a person approaching a railroad crossing did not look or listen, or that, having looked or listened, he endeavored to cross immediately in front of a rapidly approaching train which is plainly open to view, he is as a matter of law guilty of contributory negligence. (*New York Lub. Oil Co.* v. *United Railroads*, 191 Cal. 96, 101, 215 Pac. 72; *Locke* v. *Los Angeles Ry. Corp.*, 10 Cal. App. (2d) 478, 480, 51 Pac. (2d) 1111; *Rasmussen* v. *Fresno Traction Co.*, 138 Cal. App. 540, 547, 32 Pac. (2d) 1091; *Martz* v. *Pacific Elec. Ry. Co.*, 31 Cal. App. 592, 597, 161 Pac. 16.)"

The driver of the car, McGovern, testified that the rays of the light at the railway crossing formed a "curtain" through which the lights of his car would not penetrate, and he was thereby prevented from seeing the passing train. The plaintiff in a measure gave similar testimony. This testimony is so utterly contrary to common sense and everyday experience that it is not worthy of serious consideration. Furthermore, its value as evidence was clearly and fully destroyed by the testimony of Dr. George L. Shue, professor of physics at the Montana School of Mines, and by the city engineer of the city of Butte, both of whom, with other parties, made practical

demonstrations clearly showing the fallacy of the contention. It is probable that what was taken for a "curtain" was the effect of the rays of the arc light on the frosted windshield. It is a matter known to all automobile drivers that dust, water, frost or other foreign substance on the windshield naturally affects the vision of the driver. The "curtain," of itself, alleged to have obscured the vision beyond the arc light was sufficient to put the driver and the plaintiff on guard to assure safe passage of a "dangerous" crossing.

It is the rule "that, where the record presents a conflict in the evidence, resolved by the jury in favor of the plaintiff, the action of the jury precludes this court from disturbing the verdict (*Burns* v. *Eminger*, 81 Mont. 79, 261 Pac. 613; *Pierce* v. *Safeway Stores*, 93 Mont. 560, 20 Pac. (2d) 253; *Wise* v. *Stagg*, 94 Mont. 321, 22 Pac. (2d) 308), but this is true only when there is substantial evidence in the record to support the verdict and judgment (*Cannon* v. *Lewis*, 18 Mont. 402, 45 Pac. 572; *State* v. *Slothower*, 56 Mont. 230, 182 Pac. 270; *Heckaman* v. *Northern Pac. Ry. Co.*, 93 Mont. 363, 20 Pac. (2d) 258). Substantial evidence is such as will convince reasonable men and on which such men may not reasonably differ as to whether it establishes the plaintiff's case, and if all reasonable men must conclude that the evidence does not establish such case, then it is not substantial evidence. (*Thomson* v. *Virginia Mason Hospital*, 152 Wash. 297, 277 Pac. 691; *Milford Copper Co.* v. *Industrial Com.*, 61 Utah, 37, 210 Pac. 993; *Jenkins & Reynolds Co.* v. *Alpena Portland Cement Co.*, (C. C. A.) 147 Fed. 641, citing *Grand Trunk Ry. Co.* v. *Ives*, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485.) See, also, the following decisions by this court: *Black* v. *Martin*, 88 Mont. 256, 292 Pac. 577; *Carey* v. *Guest*, 78 Mont. 415, 258 Pac. 236; *Williams* v. *Thomas*, 58 Mont. 576, 194 Pac. 500, where the above definition is recognized and applied. * * * While the jurors are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court (*Grant* v. *Chicago, etc., Ry.*

*Co.,* 78 Mont. 97, 252 Pac. 382).'' (*Morton* v. *Mooney,* 97 Mont. 1, 33 Pac. (2d) 262, 265.)

Our conclusion is that the evidence clearly shows that the plaintiff's contributory negligence was the proximate cause of the accident as a matter of law, and that the judgment should be reversed and the action dismissed. In view of this conclusion, consideration of the other controverted questions is unnecessary.

The judgment is therefore reversed, and the cause remanded with instruction to dismiss the action.

ASSOCIATE JUSTICES STEWART and ANDERSON and HONORABLE RALPH L. ARNOLD, District Judge, sitting in place of MR. CHIEF JUSTICE GODDARD concur.

MR. JUSTICE ANGSTMAN:

I dissent. I think my associates are in error in holding, as they do, that plaintiff is precluded from recovery, as a matter of law, by his contributory negligence. In my opinion, that question, under the evidence, was for the jury.

It is elementary that in determining whether a case should be taken from the jury, the evidence must be viewed in the light most favorable to plaintiff, and if, when so viewed, there is room for different conclusions by reasonable men, then the case should go to the jury. The rule was stated by this court in *Jarvella* v. *Northern Pac. Ry. Co.,* 101 Mont. 102, 53 Pac (2d) 446, as follows: ''In the case of *Mellon* v. *Kelly,* 99 Mont. 10, 41 Pac. (2d) 49, 52, we said: 'This court has often announced the rule that upon motion for nonsuit or directed verdict the evidence must be viewed from the standpoint most favorable to plaintiff, and every fact must be deemed proved which the evidence tends to prove. (*Nangle* v. *Northern Pac. Ry. Co.,* 96 Mont. 512, 32 Pac. (2d) 11.) No case should ever be withdrawn from the jury when reasonable men might draw different conclusions from the evidence. (Id.)' ''

The test in determining whether plaintiff is guilty of contributory negligence is, Did he, under all the facts and circumstances, exercise reasonable care for his own safety? All the surrounding circumstances must be taken into consideration. Here it was shown that defendant had established a warning signal at the crossing in question by means of gates on which a red light was hung, and this was known to plaintiff. This alone shows that the railway company recognized the crossing to be extraordinarily dangerous, contrary to the holding of the majority. (*Jarvella Case,* supra.) The gates were not in working order at the time of the collision, and no substitute therefor was established by defendant to warn the traveling public. The gates being open, there was an invitation to cross and an assurance that the track could be crossed in safety. (Elliott on Railroads, 2d ed., par. 1157; *Pennsylvania Co.* v. *Stegemeier,* 118 Ind. 305, 20 N. E. 843, 10 Am. St. Rep. 136.) The gates being "open, they proclaim safety to the passing public; closed, they proclaim danger." (*Baltimore etc. R. Co.* v. *Landrigan,* 191 U. S. 461, 24 Sup. Ct. 137, 141, 48 L. Ed. 262.)

As was said in *Palmer* v. *New York Cent. etc. R. Co.,* 112. N. Y. 234, 19 N. E. 678, 680: "The duty of the company was imperative, and it is obvious that an open gate was a direct and explicit assurance to the traveler that neither train nor engine was rendering the way dangerous,—that none was passing. A closed gate was an obstruction preventing access to the road; an open gate was equally positive in the implication to be derived from it that the way was safe. Nothing less could be implied, and no other conclusion could be drawn from that circumstance. * * * The open gate was an affirmative and explicit declaration and representation that neither train nor locomotive was approaching with intent to pass. The way then was open to the intestate, and, as the highway was straight, that fact was apparent to him, not only when he reached the track, but for a long distance off. He had a right to rely to a certain extent upon that representation. (*Stapley* v. *Rail-*

*way,* L. R. 1 Exch. 21; *Glushing* v. *Sharp,* 96 N. Y. 676.) It is difficult, therefore, to see how his death can be attributed to any other cause than the negligent acts of the defendant; but if there is room for a different inference, there is not enough of it to make the question one of law. He could not rush heedlessly on to danger, and throw the result upon the defendant; but the degree of care required of a traveler is increased or diminished by the greater or less probability, suggested by the circumstances about him, that without it an injury will happen. When, therefore, he moves on upon the track under an assurance of safety from those owning it, and from their servants, whose especial duty it was to keep their attention fixed upon it, and who had within their power the means of avoiding the infliction of injury, and whose business it was to use them so as to prevent danger, it is for the jury to say whether the traveler exercised that ordinary care and prudence which, under the circumstances, it would be natural to expect."

This court in *Stewart* v. *Standard Pub. Co.,* 102 Mont. 43, 55 Pac. (2d) 694, applied this principle by saying: "In 45 C. J. 650, it is said: 'The governing rule is that, where a person undertakes to do an act or discharge a duty by which the conduct of another may be properly regulated and governed, he is bound to perform it in such a manner that those who are rightfully led to a course of conduct or action on the faith that the act or duty will be duly and properly performed shall not suffer loss or injury by reason of negligent failure so to perform it.' This rule therein announced is recognized by many text-writers and in innumerable decisions of the courts."

I concede that ordinarily a train on a crossing in itself constitutes a warning of danger. But here plaintiff testified that he could not see the train because a street light about 40 feet north of the train and hanging in the center of the street, formed a curtain which prevented him seeing the train until the car had passed under the light and until it was too late to stop the car before striking the train, and that he relied on the fact that the gates were up.

The question of contributory negligence under facts very similar to those here was held for the jury in the *Jarvella Case,* supra, wherein this court said: "Many cases may be found in the books holding, under varying circumstances, that plaintiffs colliding with a slowly moving train of cars or a train of cars which had been stopped on a crossing are guilty of contributory negligence. On the other hand, other cases under facts somewhat similar to those in question hold that the question of contributory negligence is one of fact for the jury. It was so held where the question was raised on the pleadings in the cases of *Central of Georgia Ry. Co.* v. *Heard,* 36 Ga. App. 332, 136 S. E. 533, and *Elliott* v. *Missouri Pac. Ry. Co.,* 227 Mo. App. 225, 52 S. W. (2d) 448; and a like result was declared where the question arose, as here, on a motion for nonsuit or directed verdict, in the cases of *Nashville, C. & St. L. Ry. Co.* v. *Nall,* 236 Ky. 554, 33 S. W. (2d) 640, *Spiers* v. *Atlantic Coast Line R. Co.,* 174 S. C. 508, 178 S. E. 136, and *Short* v. *Pennsylvania R. Co.,* 46 Ohio App. 77, 187 N. E. 737. (See, also, Blashfield's Cyc. Automobile Law, Perm. Ed., vol. 3, p. 210.) We conclude that the question of contributory negligence was properly submitted to the jury."

I concede that there are some slight distinguishing features between this case and the *Jarvella Case.* The most important difference between the two, however, is that this case presents a stronger one for the jury than the *Jarvella Case.* In that case plaintiff had not been deceived by crossing gates, as here. In that case there never had been crossing gates at the crossing in question; also, in that case there was nothing to obstruct plaintiff's vision ahead. There were buildings on the side of the highway accentuating the darkness, but they did not obstruct travelers from seeing a train on the track ahead. Here there was evidence that plaintiff could not see ahead because of the reflection of the street light. I think there is less reason in this case than in the *Jarvella Case* for holding plaintiff guilty of contributory negligence, as a matter of law. There are no

physical facts in this case which conclusively refute the evidence offered by plaintiff.

This court, in my opinion, on the evidence in the record before us is not warranted in saying that all reasonable men can arrive at but one conclusion. The jurors and the trial judge who had the advantage, denied us, of seeing the witnesses and hearing them testify, were satisfied with plaintiff's explanation as to why he could not see the train. I think that explanation was more reasonable than the one held sufficient in the *Jarvella Case*.

The evidence pointed out in the majority opinion tending to show that the bell was rung, the whistle blown and a lantern displayed by the watchman, all related to the time when the train approached the crossing and not to the time when plaintiff approached it, and, therefore, has nothing to do with the question of plaintiff's contributory negligence. The flagman was some distance from the crossing when plaintiff approached it.

I disagree also with the majority opinion in so far as it overrules the case of *Walters* v. *Chicago, Mil. & Puget Sound Ry. Co.*, 47 Mont. 501, 133 Pac. 357, 46 L. R. A. (n. s.) 702. The majority say: "It must be kept in mind that railway trains have the right of way over their own railway lines and may run their trains at will, being responsible for due care to protect the lives and property of others." I presume the majority intended to apply that statement to the facts of this case. Since we are dealing with a public crossing, I assume they intend that statement to apply to such a place. In the *Walters Case* this court, in disapproving of two federal cases [*New York Cent. & H. R. R. Co.* v. *Maidment*, 168 Fed. 21, 21 L. R. A. (n. s.) 794; *Brommer* v. *Pennsylvania R. Co.*, 179 Fed. 577, 29 L. R. A. (n. s.) 924] had this to say: "Both of the decisions just cited emanated from the Circuit Court of Appeals for the Third District speaking through Judge Buffington, and they proceed upon the mistaken ideas that a railroad has some sort of a paramount right to the use of a public highway crossing, and

that whether a citizen using the highway on approaching such crossing must stop, look and listen, depends upon the motive power he is using and its amenability to control; whereas the true rule, as we understand it, is that the citizen has an equal right with the railway company to use the crossing." I believe the *Walters Case* states the correct rule.

It is my opinion that the case was properly submitted to the jury and that the judgment should be affirmed.

Rehearing denied January 18, 1939.