PEDRO C. HERNANDEZ, PLAINTIFF AND APPELLANT, *v.*
CHICAGO BURLINGTON AND QUINCY RAILROAD
COMPANY, A CORPORATION, DEFENDANT AND RESPONDENT.

No. 10801
Submitted October 14, 1964. Decided January 28, 1965.
Rehearing denied February 24, 1965.
398 P.2d 953.

J. H. McAlear (argued), Red Lodge, Robert H. Wilson (argued), Hardin, Chas. E. Snyder (argued), Helena, for appellant.

William R. McNamer (argued), Cooke, Moulton, Bellingham & Longo, Billings, Kronmiller & Freeman, Hardin, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an action under R.C.M.1947, section 93-2809, which provides that a parent may maintain an action for the injury or death of a minor child when such injury or death is caused by the wrongful act or neglect of another. The section further provides that such ''action may be maintained against the person causing the injury or death, or if such person be employed by another person who is responsible for his conduct, also against such other person.''

The case was tried before a jury on March 9, 1964, before the Honorable C. B. Sande, District Judge of the 13th Judicial District. At the conclusion of the plaintiff's case in chief, the district court sustained a motion for a judgment of dismissal and nonsuit, and for a directed verdict on the grounds of insufficiency of the evidence; that it was not shown that the crossing was unusually hazardous; that the presence of the train on the track itself was a warning; that the evidence

did not show negligence on the part of the defendant; and that the evidence showed that the negligence of the driver Herman R. Rodriquez, in failing to exercise due care, was the sole proximate cause of the accident.

It is from the granting of these motions and entry of judgment that the plaintiff appeals.

On November 21, 1962, shortly before 8:00 p.m., an automobile being driven by one, Herman R. Rodriquez, crashed into the side of a moving freight train at a railroad crossing on Montana Highway No. 47, a state secondary highway, about 4.8 miles north of Hardin. The car-train collision resulted in the death of Benjamin Hernandez, the minor son of the plaintiff, Pedro C. Hernandez.

The crossing in question is on a spur line which is only used seasonally during the sugar beet harvest in the Fall of the year. Beet harvest started on October 29th and for the ten days preceding November 21st the train crossed the crossing most of the nights. At the time of the collision the train was proceeding from the Kingsley beet dump, the northerly terminus of the spur line to Hardin pulling a thirty car train of sugar beets.

The track crossing where the accident occurred angles in a southerly direction, and then the track runs parallel with the highway. The train was moving in a southerly direction so that Herman Rodriquez, the driver of the car in which the deceased was riding, could not see the headlights on the train engine as he approached the crossing from the north.

The train was made up of dark colored, rust red beet cars. Its length was approximately 1,230 feet, consisting of thirty beet cars. The Rodriquez' car came into collision with the twenty-seventh car passing the crossing. The night was described by witnesses as being unusually dark.

Rodriquez, the driver of the car in which the decedent was riding, saw the train on the crossing when he was about 150 to 200 yards from the crossing. He attempted to stop but was

unable to do so. The train was moving about ten miles per hour when struck by the car. The right door of the car flew open, decedent fell out and was run over by the moving train.

Rodriquez was an 18 or 19 year old Mexican National who neither spoke, read nor understood English. He had owned the car since June or July and had purchased it in the name of Mrs. Hernandez, the mother of the deceased, and a passenger in the car that fateful night, because as she explained, Rodriquez wasn't of age. Rodriquez did not have a driver's license, and has since been deported to Mexico.

The train crew testified that they had placed a red safety fusee at a point to the south of the railroad crossing. The conductor testified it was not the duty of the brakeman to put out fusees, but they had put them out at each of the crossings they had gone over that night; that at night or during bad weather they always put out fusees, and that they had every night for the last ten nights; that there are no orders or directives or regulations that require putting out fusees at crossings such as the one in question; that he did not think it was necessary to put out such fusees, but he did think that it was a good idea; and that the bell was rung, the whistle was blown, and an oscillating headlight was in motion in addition to the regular headlight being on.

In opposition to the train crew's testimony, plaintiff offered testimony of Mrs. Hernandez, a passenger in the car and a wife of the plaintiff, and testimony of two individuals who resided in a house near the crossing. Mrs. Hernandez testified that she had not seen a fusee at the crossing the night of the collision, nor at any time previous to that.

Fred Schmidt, a resident of a nearby house, testified that he did not hear a bell or whistle; that he was watching television but could see the railroad crossing through a window which was near the TV set; although on other occasions he had seen red flares used at the crossing, he did not see any red flare the night of the collision; that he was watching the TV pro-

gram "Red Skelton" in which he was interested and did not pay much attention to the train; and that the driver of the wrecked car came to his house for help. Mr. Schmidt went with him to the crossing and at that time did not see a fusee either.

The father of Fred Schmidt, John Schmidt, testified substantially the same as his son. However, his interest in trains seemed to have been substantially greater. He testified in great detail as follows:

"Q. Had a fusee been put out on any prior times? A. Well they had it out the first night, they had one out, and the third night; the fourth night and the fifth night they never had nothing out.

"Q. And are you positive in your mind and in your recollection on that? A. Yes.

"Q. How about whistling at the crossing? A. They never did whistle, they whistled three times in the four times they whistled, and the fifth time they never whistled, that was the night that accident happened.

"Q. How many nights had they whistled? A. Four times."

Patrolman Whaley, who investigated the collision, testified that in 1962 the average daily traffic on State Highway 47 was 1,180 vehicles. This testimony was objected to, and on appeal was assigned as cross-error.

The patrolman testified that the tires on the Rodriquez car were smooth, but that this would not have much effect on stopping distance; and that the brakes were not working as well as they should have been. He estimated the speed of the Rodriquez' vehicle to be between 48 and 55 miles per hour. He further testified that these estimated speeds could be plus or minus 10 percent.

According to Patrolman Whaley's testimony on the night of the collision, he examined the area where the fusee was supposed to have been placed, but found nothing; that the morning after the collision, he went back to the crossing and found the remains of only one fusee which was distorted and disturbed;

that it was found at the same location that had been searched the night before; which was also at the same location the train crew contended they had placed the fusee the night of the collision.

The highway in approaching the crossing was of a dark oil or asphalt surface; it was straight for over a mile. There were no obstructions which would hinder the view of the crossing. There were no flashing signal lights at the crossing, but there was a round railroad warning sign located 402 feet north of the center of the crossing, and a cross-arm railroad crossing sign located 106 feet north of the center of the railroad crossing. Both signs had reflectorized surfaces.

The plaintiff contends the court erred in granting defendant's motion for dismissal; in directing a verdict in favor of the defendant and against the plaintiff; in entering judgment of dismissal against the plaintiff and in favor of the defendant; and, in removing the cause from consideration by the jury.

The assigned cross-error concerning Rodriquez's oral admissions came about because Rodriquez was not available as a witness at the trial. But an offer of proof was made that Rodriquez had given a statement to Patrolman Whaley, both oral and written. The cross-assignments of error go to these as well as testimony of Patrolman Whaley concerning traffic counts on the highway. The count was taken some distance from the crossing in question, and possibly included traffic from shift changes at a nearby sugar factory.

However, since we turn this opinion on the one problem presented by plaintiff as to the following issue, the cross-assignments of error need not be considered.

The issue presented is whether the plaintiff, in his case in chief, has shown substantial evidence to make a prima facie case of negligence against the defendant railroad sufficient to go to the jury.

R.C.M.1947, § 93-5205, provides:

"Where, upon the trial of an issue by a jury, the case

presents only questions of law, the judge may direct the jury to render a verdict in favor of the party entitled thereto.''

''* * * whether there is any substantial evidence in the case made by the party upon whom the burden rests is always a question of law. If there is not, the court ought to withdraw the case from the jury and direct judgment.'' Escallier v. Great Northern Ry. Co., 46 Mont. 238, 252, 127 P. 458, 462.

M.R.Civ.P., Rule 41(b), provides:

''After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.''

In order for plaintiff to recover, he must show that the defendant railroad did not use ordinary care, or that the railroad was held to a higher than ordinary duty of care and did not use such care as was required.

At the crossing where the accident occurred, the Montana Railroad Commission had not ordered electric bells or other signal devices to be installed as provided for by section 72-164, R.C.M.1947. It is not contended that such devices were necessary. There was an unobstructed view of the railroad track for a distance of more than one-half mile on either side of the crossing.

Plaintiff's attorney, Mr. McAlear, conceded as follows:

''There were no buildings in the background, there was shrubbery at the side but that shrubbery could not be construed as being obstruction to the view of the crossing. The dark cars of course are a factor. Now other than that, I don't know of any physical obstructions.''

Upon motion for nonsuit or directed verdict, the evidence must be viewed from the standpoint most favorable to plaintiff, and every fact must be deemed proved which the evidence tends to prove. Nangle v. Northern Pac. Ry. Co., 96 Mont. 512, 32 P.2d 11; Mellon v. Kelly, 99 Mont. 10, 41 P.2d

49; Jarvella v. Northern Pac. Ry. Co., 101 Mont. 102, 53 P.2d 446; Broberg v. Northern Pac. Ry. Co., 120 Mont. 280, 284, 182 P.2d 851. Thus, the court must view the case at bar as though no fusee was put out at the crossing in question the night of the collision. Further, as was held in Broberg v. Northern Pac. Ry. Co., supra, it is well-settled that the negligence, if any, of the driver of a vehicle is not to be imputed to a passenger. The default of a driver in disobeying the provisions contained in R.C.M.1947, § 72-164, cannot, by imputation, be made the default of a passenger. (See also, Grant v. Chicago etc. Ry. Co., 78 Mont. 97, 252 P. 382; Wolf v. Barry O'Leary, Inc., 132 Mont. 468, 318 P.2d 582.)

This court, in the Broberg case, supra, fully stated the rule that we must consider here, when at page 289 of 120 Mont., page 856 of 182 P.2d it said: "The rule of law applicable to extrahazardous crossing has been laid down by this court in the Jarvella and Incret cases (Jarvella v. Northern Pac. Ry. Co., 101 Mont. 102, 53 P.2d 446; Incret v. Chicago, M., St. P. & P. Ry. Co., 107 Mont. 394, 86 P.2d 12) and in Norton v. Great Northern R. Co., 78 Mont. 273, 254 P. 165. In the Jarvella case we held upon numerous supporting authorities from other jurisdictions that at an *ordinary crossing* where a train has stopped on the crossing or is moving slowly over it, [it] is not negligence on the part of the railroad company in failing to blow the whistle or ring the bell or place warning lights along the train or provide a flagman to warn the traffic. In the Incret case we stated the reason for the above rule which is that a train standing on or passing over a railroad crossing is in itself a sufficient warning of danger to the traveling public unless the crossing be extrahazardous. Finally, in the Incret case, we stated the rule apparently recognized by appellants, that if the crossing is extrahazardous the general rule does not apply."

The court went on to say at page 290, 182 P.2d at page 856, "The question as to whether or not the crossing involved in this

action was extrahazardous resolves itself, under the rule approved by this court in the Jarvella case to this: Were there present for the determination of the jury any peculiar or unusual facts and circumstances or any peculiar environment rendering the situation unusually hazardous."

A few facts presented in the Broberg case compare with the facts in the case at bar. There the collision occurred on a heavily travelled highway, Highway No. 10, as it crossed a spur track of the Northern Pacific Railway which was used seasonally for the sugar beet harvest. The night of the collision was very dark and cloudy. The surface of the highway was "blacktop" and was black in color. About 350 feet from the crossing there was a standard highway department railroad crossing sign, painted with luminous paint.

Facts which set the Broberg case aside from the case at bar are that the highway sloped downward to 11.6 feet at 350 to 450 feet west of the crossing. There was testimony that the standard railroad crossing sign was "grey and old." There was a row of telephone or telegraph poles bearing a mass of wires which were very heavy. There was extensive weed growth along the north side of the highway and an irrigation ditch bank there. On the south side of the highway there was a continuous line of heavily bushed ash trees extending to within a few feet of the crossing.

The train consisting of an engine and eleven gondola cars was engaged in switching operations. It was moving across the crossing at a speed of three or four miles an hour. The driver of the car which collided with the train, ran into the middle of the eleventh, or last car, of the train. She was traveling at an average speed of about 30 miles per hour at the time she saw the train on the tracks ahead of her. Under these facts the court in the Broberg case by a three to two decision found that the facts presented conditions which were sufficient to take the case to the jury on the question whether

their *cumulative effect did or did not render the crossing extra-hazardous.*

At page 296 of 120 Mont., page 860 of 182 P.2d in the Broberg case, the court cites the rule set out in 60 A.L.R. at page 1106, that " 'Where the evidence shows that a railroad crossing is for any reason peculiarly dangerous, it is a question for the jury whether the degree of care which a railroad company is required to exercise to avoid accidents at crossings imposes on the company the duty to provide safety devices at that crossing.' " The court went on to say at page 1113 of the same treatise, "the law is stated as follows: 'Evidence that a traveler's view of approaching trains is obstructed may warrant a finding that the railroad was negligent in failing to maintain gates or other safety devices at the particular crossing.' " As was said in Wrzesinski v. Chicago, M., St. P. & P. R. Co., D.C., 207 F.Supp. 460, 465, "Generally the cases have considered obstructions to vision or hearing sufficient to support a jury finding that a crossing is extrahazardous. No distinction is made between obstacles which hide a train on a crossing or the crossing itself, and those which hide trains approaching a crossing."

In the case at bar, the evidence is that there were no obstructions to the driver's view as he approached the crossing. The highway was straight for over one-half mile on each side of the crossing as it approached it. Unlike the facts in the Broberg case, where there was a downward grade which reached 11.6 feet at 350 to 450 feet from the crossing, the highway as it approached the crossing in question was perfectly level. The view to either side was completely unobstructed. There were no telephone wires, no growth of weeds, no trees, and no ditch banks. The railroad crossing warning signs were clear and in well-kept condition, with reflectorized surfaces.

In a later case, Dimich v. Northern Pacific Ry. Co., 136 Mont. 485, 348 P.2d 786, this court, again divided three to two, held that the issue of extra-hazardous crossing was for the jury

under proper instructions. Chief Justice James T. Harrison and Associate Justice Castles of the present court dissented on this ground as well as others. But, even so, in the Dimich case there were no warning signs of any type as different from the instant case. The approaching highway grade was such that headlights could not play upon the locomotive occupying only a portion of the highway until the automobile was a short distance away. There was also a dispute as to whether the train was on the crossing or approaching it in the Dimich case. These facts alone distinguish that case.

■ There were no peculiar or unusual facts or circumstances or any peculiar environment which rendered this crossing unusually hazardous. As was pointed out by Justice Cheadle in the dissenting opinion in the Broberg case, if a dark colored road surface which tends to absorb the lights of an automobile makes a crossing extra-hazardous, then every railroad crossing of an oiled highway in Montana is likewise unusually hazardous.

■ The infrequency of the use of the crossing may effect the care needed by the railroad when approaching the crossing, but when the train is on the crossing, this is of itself a sufficient warning of danger to the traveling public. A railroad crossing is as a matter of law, a place of known danger and one is bound by law to recognize it as such. Roberts v. Chicago, M. & St. P. Ry. Co., 67 Mont. 472, 216 P. 332; West v. Davis, 71 Mont. 31, 227 P. 41; Incret v. Chicago M. St. P. & P. Ry. Co., 107 Mont. 394, 86 P.2d 12; Monforton v. Northern Pac. Ry. Co., 138 Mont. 191, 355 P.2d 501. The railroad has a right to expect that motorists will approach a railroad crossing with caution. The railroad is not bound to protect against the negligence of a motorist.

■ The number of automobiles passing over a railroad crossing will not, of itself, make a crossing extrahazardous. Each automobile passing over the crossing in question had an equally unobstructed view of the crossing. Each automobile approaching the crossing while the train was moving across the crossing

had sufficient warning of danger from the very presence of the train on the crossing.

The appellant contends that the railroad's previous acts of putting out fusees would be a recognition that the crossing was extra-hazardous, and also that the failure to put the fusee out the night of the collision would provide a basis for recovery under the theory of failure to comply with a custom. First, it is clear that the railroad cannot make a crossing which is not extra-hazardous, extra-hazardous simply by putting out fusees. Secondly, there was no showing of any reliance, by Rodriquez, on any custom of the railroad. Such reliance is a necessary prerequisite to any recovery on the theory of custom. It is stated in 75 C.J.S. Railroads § 792, at page 63: "Before the traveler's duty to exercise his senses in crossing the tracks may be minimized on the ground of his reliance on the absence of a flagman's warning or on the open condition of a gate, it must appear that he relied and had reason to rely on the usual maintenance of a flagman or operation of the gate."

Such reliance would only free the driver of contributory negligence; it would not affect the question of the railroad's primary negligence. In Pennsylvania R. Co. v. State, 188 Md. 646, 53 A.2d 562, the court adopted as a correct statement of the law, the rule that knowledge or lack of knowledge of a custom to warn, or of the fact that customary protective signals have been abandoned or are not in operating condition, has an important bearing on the question of contributory negligence, but it does not affect the question of primary negligence. Thus, even if there were reliance by Rodriquez on a custom of the railroad, this would not affect the issue of whether the railroad was negligent in regard to the plaintiff's son, Benjamin Hernandez. The doctrine of reliance on a custom has no merit in the present case.

Since there were no peculiar or unusual facts or circumstances or any peculiar environment which rendered this crossing extra-hazardous, there was no question for the jury to determine, and

the court did not err in granting defendant's motion for dismissal, and in directing a verdict in favor of the defendant and against the plaintiff.

For the foregoing reasons, the judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES CASTLES and DOYLE concur.